# Illinois Official Reports

## Appellate Court

---

**In re Marriage of Iqbal, 2014 IL App (2d) 131306**

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF UZMA IQBAL, Petitioner and Counter-respondent-Appellee, and MOHAMMAD VAJAHATH KHAN, Respondent and Counterpetioner-Appellant. |
| District & No. | Second District <br> Docket No. 2-13-1306 |
| Filed | May 6, 2014 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In marriage dissolution proceedings, the trial court did not err in finding that the parties' postnuptial agreement was not enforceable, especially when it gave the parties' counselor sole power to determine which parent would have custody of the children, to determine whether a party was "reasonably" seeking a divorce, and whether a party had violated the agreement to such an extent that he or she should forfeit any claim to custody, and, furthermore, the agreement was unconscionable to the extent that petitioner would forfeit all rights to the parties' residence if she "unreasonably" filed for divorce, but the meaning of "unreasonable" was vague, the trial court's denial of respondent's request for the appointment of a custody evaluator was presumed to be in conformity with the law and to have a sufficient factual basis in the absence of an adequate record, the grant of sole custody to petitioner was not against the manifest weight of the evidence, and the trial court did not abuse its discretion in awarding the majority of the marital estate to petitioner and finding that she was also entitled to maintenance. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, Nos. 11-D-1526, 11-F-284; the Hon. Neal W. Cerne, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on Appeal | Omar Jaleel, of Jaleel Law P.C., of Oak Brook, for appellant. |
| | Michael G. DiDomenico and Sean M. Hamann, both of Lake Toback, of Chicago, for appellee. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
| | Justice Zenoff concurred in the judgment and opinion. |
| | Presiding Justice Burke specially concurred, with opinion. |

**OPINION**

¶ 1  The respondent, Mohammad Khan, appeals from certain rulings the trial court entered during the proceedings dissolving Mohammad's marriage to the petitioner, Uzma Iqbal. We affirm.

¶ 2  I. BACKGROUND

¶ 3  We recount only the basic facts of the marriage here. The remaining facts pertinent to this appeal will be discussed as applicable to each issue.

¶ 4  The parties married in 2002 in Canada. They had three children: Ahmad, born September 3, 2002; Habeeb, born January 6, 2005; and Fatimah, born April 27, 2008. After living in Illinois for a few years, the family lived in Saudi Arabia from 2005 to 2010, where they had a comfortable lifestyle with a 6,000-square-foot house and maid service.

¶ 5  Mohammad has degrees in commerce and information technology management from institutions in India. His most recent job in his field was in Saudi Arabia as an information technology project manager. According to Mohammad, since returning to Illinois in March 2013, he has been unable to find a job in his field. At the time of trial, he had been working part-time on a farm for about a month, earning $150 per week. He was also receiving financial support from his brother. Uzma has a degree in dental surgery from a college in India, but that degree did not allow her to practice dentistry in the United States without further education and examinations. At the time of trial, she was taking classes in public health and was nearing her certification in system analytical software.

¶ 6  When the parties married, Mohammad owned a home at 925 Iroquois Avenue in Naperville. Since 2002, it has been maintained using marital funds, and its value at the time of

trial was approximately $350,000. The mortgage was paid off in 2007 and there are no encumbrances on the house. The house was rented to tenants when the family went to Saudi Arabia, and it remained rented (generating a monthly rent of about $1,900) at the time of trial.

¶ 7　　When Uzma and the children returned to Illinois in October 2010, there were still tenants in the house, and the family moved into a condominium at 1160 Spring Garden Circle in Naperville that was owned by Mohammad's sister and her husband. A few months later, Mohammad also returned to Illinois and joined his family in the condominium. He decided, over Uzma's objections, to purchase the condominium from his sister and brother-in-law for $97,000, but changed his mind almost immediately and sold it back to them four days later. In the interim, however, Mohammad's brother-in-law had used the money from the sale in his own home. Accordingly, Mohammad's sister and brother-in-law returned only $45,000 cash in two installments. However, they also asserted that the parties owed them $5,000 in repair costs and $39,260 in rent, association fees, and utilities that accrued while the parties' family was living in the condominium.

¶ 8　　In May 2011, Mohammad filed a petition for temporary custody of the children, alleging that he feared that Uzma planned to take them out of Illinois. That case (No. 11-F-284) was later consolidated with the divorce case initiated by Uzma, who filed a petition for dissolution in July 2011. Mohammad filed a counterpetition for dissolution in June 2012.

¶ 9　　In September 2011, Mohammad accepted a job offer in Saudi Arabia, where he remained until March 2013. During this 18-month period, the children lived with Uzma in Naperville. Mohammad visited them during periodic trips to Illinois.

¶ 10　　In August 2013, Mohammad filed a motion asking the trial court to declare a postnuptial agreement (PNA) signed by the parties to be valid and enforceable. The trial court ruled that the PNA was unenforceable because it violated public policy and was so one-sided and "draconian" that it was substantively unconscionable.

¶ 11　　In September 2013, a five-day trial on all issues commenced. On November 21, 2013, the trial court entered a judgment for dissolution of marriage. Uzma received sole custody of the children and the majority of the marital property (about 65%), and Mohammad was made responsible for all of the marital debts (over 80% of which was the debt allegedly owed to his sister and brother-in-law in connection with the family's use of the condominium). The trial court stated that a disproportionate division of the marital property and debts was warranted because, although the children required additional child support and Uzma deserved maintenance, Mohammad's low income prevented it from ordering higher support payments. Mohammad filed a timely notice of appeal.

¶ 12　　　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 13　　On appeal, Mohammad contends that the trial court erred in: ruling that the PNA was unenforceable; denying his request to appoint a custody evaluator pursuant to section 604.5 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.5 (West 2012)); and awarding Uzma sole custody of the children, maintenance, and a disproportionate share of the marital estate.

¶ 14 Uzma's response brief includes a request that this court strike Mohammad's opening brief. She argues that it violates Illinois Supreme Court Rule 341 (eff. Mar. 16, 2007), because his statement of facts contains errors and improper argument. Although this court has discretion to strike a brief and dismiss an appeal where a party has failed to comply with Rule 341, doing so is a harsh sanction and is appropriate only when the procedural violations interfere with our review. *Carter v. Carter*, 2012 IL App (1st) 110885, ¶ 12. Here, Mohammad's violations of Rule 341 are not so severe as to preclude our review of the issues, and we therefore decline to strike his brief. We disregard any improper argument and any facts not supported by the record.

¶ 15                                    A. Jurisdiction

¶ 16 Before addressing the merits of this appeal, we must examine whether we have jurisdiction over the appeal. *In re Marriage of Link*, 362 Ill. App. 3d 191, 192 (2005).

¶ 17 Uzma argues that we lack jurisdiction. She asserts that the judgment for dissolution was not a final order from which an appeal could be taken because, although the trial court found that she was "entitled to receive maintenance," it "reserved" the amount of such maintenance. The trial court did not indicate that it planned to revisit the issue of maintenance at any particular time. Uzma argues that, because no amount of maintenance was set, the judgment for dissolution was not immediately enforceable in that respect, and so the judgment was not final.

¶ 18 Uzma is correct that, in general, an order must be final in order to be appealable. *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, ¶ 9. "A judgment is final if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with execution of the judgment." *Lamar Whiteco Outdoor Corp. v. City of West Chicago*, 395 Ill. App. 3d 501, 504-05 (2009).

¶ 19 Nevertheless, we reject Uzma's argument that the judgment for dissolution was unenforceable and nonfinal. Instead, we view the trial court's act of "reserving" the amount of maintenance, without stating that it planned to set that amount at any particular time, as equivalent to setting the amount of maintenance at zero until further order of court. Such an award is immediately enforceable and appealable. *Id.*

¶ 20 This court has long held that a trial court's "reservation" of jurisdiction over an issue in a domestic relations order does not necessarily indicate that the order is nonfinal. See *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 167-68 (2005) (discussing the "reserved-jurisdiction" approach to maintenance awards); *In re Marriage of Marriott*, 264 Ill. App. 3d 23, 41 (1994); *In re Marriage of Bingham*, 181 Ill. App. 3d 966, 971 (1989). Rather, trial courts often refer to "reserving" an issue when they wish to indicate that, although the issue requires no further adjudication at the moment, they wish to preserve the ability to reopen it in the future if circumstances warrant. Thus, the order must be examined as a whole to determine the trial court's intent in using the term "reserved." Where an order demonstrates that the trial court has not yet made a final determination on an issue, the order is nonfinal (and thus nonappealable). See *In re Marriage of Jensen*, 2013 IL App (4th) 120355, ¶ 23. On the other hand, where the trial court has determined the issue and merely intends to preserve its

ability to enter a modification in the future if necessary, the order is final and appealable. See *In re Marriage of Cannon*, 112 Ill. 2d 552, 553-54 (1986) (dissolution judgment was final and appealable despite trial court's statement that it intended its maintenance award to " 'be reviewable no later than the expiration of two years and sooner if the circumstances of the parties change significantly' "); *In re Marriage of Bothe*, 309 Ill. App. 3d 352, 355 (1999) (trial court's order abating maintenance until further order of court was final and reviewable); *Bingham*, 181 Ill. App. 3d at 971 (judgment for dissolution that awarded wife no maintenance but reserved the issue for two years was final and appealable).

¶ 21    In support of her argument that we lack jurisdiction, Uzma cites *Jensen*, 2013 IL App (4th) 120355. In that case, the trial court bifurcated the dissolution proceedings and eventually entered an order finding that, although the wife was entitled to maintenance by virtue of the length of the marriage and the disparity between the parties' earning capacities, the husband could not afford to pay maintenance at the time of the order. The order provided that " '[t]he issue of maintenance is reserved *** to be revisited in six months along with the status of [the husband's] employment and his income.' " *Id.* ¶ 36. The reviewing court found that the trial court's reservation of the amount of maintenance, together with its stated intent to revisit the issue at the end of six months, rendered the order nonfinal and nonappealable. *Id.* ¶ 39.

¶ 22    *Jensen* is not applicable here, where the trial court's order did not set any time period for revisiting the amount of maintenance. Rather, the trial court's order here is similar to the order at issue in *Bothe*, 309 Ill. App. 3d 352, in which the trial court abated maintenance subject to further order of court. We held that the order in *Bothe* was "a final determination" on the issue of maintenance that "merely retained jurisdiction to award maintenance if later circumstances warranted." *Id.* at 355. Accordingly, we had jurisdiction over the appeal. *Id.* Similarly, in this case the trial court's "reservation" of the amount of maintenance–without setting a time for the determination of that amount–merely indicated that the court was preserving its ability to modify its award of zero maintenance if there was a change in circumstances.

¶ 23    Uzma also cites to the dissent filed in a recent decision of this court, *In re Marriage of Heinrich*, 2014 IL App (2d) 121333. In that case, like this one, the husband filed a motion for a declaratory judgment as to the validity of an agreement between the parties (there, a prenuptial agreement). *Id.* ¶ 13. The trial court ruled that the agreement was valid. It did not initially include in this ruling any finding of immediate appealability pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). Seventeen months later, in response to a motion to reconsider, the wife sought the entry of a finding that the declaratory judgment ruling was immediately appealable under Rule 304(a), and the trial court granted her motion. *Id.* ¶ 25. On appeal, this court addressed the issue of whether we had jurisdiction to consider the appeal. Relying on *In re Marriage of Best*, 228 Ill. 2d 107, 113 (2008), in which the supreme court held that a declaratory judgment ruling entered during the course of dissolution proceedings was appealable under Rule 304(a), we concluded that we had jurisdiction. See *Heinrich*, 2014 IL App (2d) 121333, ¶¶ 30-31. Justice Hutchinson dissented, arguing that a declaratory judgment ruling was immediately appealable even without a Rule 304(a) finding and that the appeal was thus untimely. See *id.* ¶ 78 (Hutchinson, J., dissenting). We agree with the majority in *Heinrich* and reject Uzma's invitation to follow Justice Hutchinson's dissent. As the judgment for

dissolution here was final and appealable, and the declaratory judgment ruling was not independently appealable without a Rule 304(a) finding, we have jurisdiction to decide the appeal, including the declaratory judgment ruling. We therefore turn to the merits of the appeal.

### B. Validity of the Postnuptial Agreement

Mohammad first argues that the trial court erred in determining that the PNA executed by the parties was invalid and unenforceable. The evidence relevant to the PNA is as follows.

In November 2006, Uzma and the children went to stay in a women's shelter. (The record is not clear as to whether this was in Illinois or Saudi Arabia.) At the parties' request, Fisal Hammouda, a businessman who also served as a marriage counselor within the Muslim community, acted as a mediator. Hammouda spoke several times with both parties and ultimately put together the PNA.

The PNA began by reciting that the parties wished to define their rights to their separate and joint property, "with the express understanding that neither party wishes to obtain a divorce or legal separation." The parties then designated Hammouda as their "Religious and Marital Counselor and Arbiter of their Marital Affairs" and agreed that "his authorization and approval [was] required for any major decisions, including but not limited to *** financial matters, matters of the Children, work and travel, and any contemplated divorce or separation."

There followed 34 numbered paragraphs concerning a variety of topics, many of which concerned daily life (*e.g.*, requiring the parties to speak politely to and about each other, and to allow free communication with various relatives) or certain household arrangements (*e.g.*, providing Uzma with a monthly allowance and a maid, and enabling her to travel with the children). However, several clauses placed greater obligations and restrictions on the parties:

> "1. Husband shall name Wife as a tenant by the entirety of the property located at 925 Iroquois Avenue, Naperville, *** previously owned as Husband's separate property. *** Counselor will be an additional signatory on the property, and his signature is required for any transfer of rights in the property to be valid and binding, and no transfer may occur without Counselor's signature, and the signature of Husband and/or Wife. It is further agreed, that Wife's share in said home will vest at twenty-five (25) percent per year, in her half of the property. Wife will be fully vested in her share of the home after four (4) years of marriage. Should Wife unreasonably file for divorce (without Counselor's written approval), she will forfeit her and her heirs and/or assigns['] right to any share of the home. Should Wife reasonably file for divorce (with Counselor's written approval) she will be entitled to her vested share in the home at the above rate.

> * * *

> 7. Husband and Wife agree to base their life and marriage on the Holy Quran and Sunnah, as practiced in the Islamic religion.

> 8. Husband and Wife agree to make a good faith and sincere effort to make their marriage work and last their entire lives. Husband and Wife further agree that an

- 6 -

unreasonable divorce is not in the best interests of their Children, and their continued marriage is in the best interests of their Children.

9. Husband and Wife agree that an unreasonable divorce (without Counselor's express written approval) is a violation and contrary to the purposes and intents of this agreement, and an unreasonable divorce sought by either party will forfeit their rights to custody of the children and any rights conveyed in this agreement. If either party seeks an unreasonable divorce, they hereby agree to surrender full custody rights to the other, and agree to only reasonable visitation rights to the Children.

\* \* \*

13. Husband and Wife agree not to call the authorities or police for any incident, unless an [*sic*] life or death emergency and for the benefit of the other, without first consulting and discussing the matter with Counselor and obtaining his express written approval for further action. Violation of this clause is grounds for forfeiture of the violating party's rights herein.

\* \* \*

20. Husband and Wife agree to consult with Counselor over any significant problem or major issue, and agree that Counselor's opinion and decision will be final and binding on both of them, and both agree to respond and act according to Counselor's opinion and decision.

\* \* \*

27. Husband and Wife agree that any violation of any one or more of the clauses of this agreement, avails each party to forfeiture of all rights herein, as reasonably decided by Counselor, including but not limited to any and all rights to property, monies and/or custody of the Children. Both Husband and Wife further agree that the decision of Counselor is final and binding on both Husband and Wife.

28. Husband and Wife agree, that in consideration of Husband's separate property being made joint property, as well as the conditions set and described herein, Husband and Wife herewith agree to share in each other's estate upon death, whether by will, statutory share, dower and/or curtesy, whether such right now exists by case law or by statute, and further waives their right to alimony, whether permanent or rehabilitative, separate maintenance, or any other forms of spousal support.

\* \* \*

32. All matters, including those not specified herein and agreed upon by Husband and Wife, shall be dealt with and handled by consultation with Counselor or his designee, and according to Islamic law. Counselor hereby agrees to deal with both parties fairly and in good faith, and to reasonably follow Islamic Law, including the Holy Quran and Sunnah, to the best of his understanding."

Paragraphs 29 and 30 of the PNA stated that each party had been given "full disclosure of all financial matters and information of the other" and the opportunity to consult with independent counsel of the party's choice. Paragraph 31 of the PNA provided that it could be

modified only in a writing signed by both parties and Hammouda. Finally, paragraph 34 was a severability clause stating that, if any clause of the PNA were found invalid or unenforceable, it would not affect the validity of any other clause or of the PNA as a whole. The PNA was signed on January 30, 2007, by Mohammad, Uzma, Hammouda, and two witnesses.

¶ 29    At the time the parties entered into the PNA, the house at 925 Iroquois was the largest asset in the marriage. Uzma testified at trial that the parties had also owned stock that Mohammad had bought in 2005 for $8,000 and burial plots worth $4,000. Mohammad contends that the parties also had about $150,000 in a joint bank account, but Uzma testified only that this asset existed in 2011, and there was no evidence that it existed in 2007 when the PNA was signed.

¶ 30    Hammouda testified at trial that the PNA was created by taking Uzma's "demands" and Mohammad's responses, going back and forth between the parties until they both agreed on the terms, and then having a lawyer (Hammouda's son, who also represented Mohammad at one point) draft the PNA. Hammouda himself inserted paragraph 9, and the parties agreed to it. When asked what the definition of an "unreasonable divorce" was, Hammouda responded: "Unreasonable based on any measures that you can ask for. For example, if you are getting everything that you want and just for the sake of just one [*sic*; want?] divorce, then this is unreasonable. The person has to provide a reasonable reason for the divorce."

¶ 31    Hammouda further testified that various paragraphs were inserted at Uzma's behest and that she would not allow Mohammad to see the children until after the PNA was signed. Hammouda believed that Uzma had consulted a lawyer before signing the PNA, but he did not know whom. Uzma disputed Hammouda's account, testifying that she was not consulted on the contents of the PNA, which was drafted by Mohammad and Hammouda.

¶ 32    About six weeks before trial, Mohammad moved for a declaratory judgment that the PNA was valid, seeking to enforce paragraph 1 of the PNA. (This was the paragraph that specified Uzma's rights to the property at 925 Iroquois.) Mohammad argued that Uzma had forfeited all interest in the property because she did not obtain written authorization from Hammouda before she filed her petition for dissolution. The trial court found the PNA invalid and unenforceable for a variety of reasons. It believed that the PNA impermissibly delegated the parties' rights to make major life decisions, including whether to get a divorce, to a third party. It also noted that some of the consideration for Uzma giving up various rights including the right to seek maintenance–specifically, the retitling of the property at 925 Iroquois into both parties' names–was of little value, given that the property was likely transmuted into marital property even without the PNA, as marital funds had been used to pay the mortgage since 2002 and the mortgage was ultimately paid off using marital funds. The trial court also found the PNA substantively unconscionable because it was one-sided, and "draconian" in that it discouraged the parties from violating any of the terms by threatening the loss of custody of the children as well as the forfeiture of property rights. Finally, the trial court found that the term "unreasonable divorce" was not defined within the PNA and instead was left solely to Hammouda's interpretation.

¶ 33    Mohammad argues that the trial court erred in finding the PNA unenforceable. We review *de novo* the trial court's determinations with respect to the PNA. See *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006) (construction of a contract and determination of unconscionability reviewed *de novo*); *In re Marriage of Rife*, 376 Ill. App. 3d 1050, 1063 (2007) (agreement's validity under public policy reviewed *de novo*). We note that the PNA has a religious component (see paragraph 7). Courts must resolve disputes involving religion by applying neutral principles of secular law in such a manner as to avoid excessive entanglement with religious doctrine. *In re Marriage of Goldman*, 196 Ill. App. 3d 785, 793-95 (1990). Here, neither party has argued that determining the validity of the PNA requires the application of religious doctrine; instead, both parties rely on secular principles of contract law.

¶ 34    We begin with the argument that the PNA is unenforceable because it violates public policy. The public policy of this state is reflected in its constitution, statutes, and judicial decisions. *Rife*, 376 Ill. App. 3d at 1063. Whether a private agreement between parties, such as the PNA at issue here, is contrary to public policy depends on the particular facts of the case. *Id*. In deciding whether an agreement is against public policy, a court must consider "whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest." *Id*.

¶ 35    It is the public policy of this state that courts have an independent duty to ensure that the arrangements made by divorcing parents that directly affect their children–those relating to custody, child support, and visitation–are in the best interest of the children. *Blisset v. Blisset*, 123 Ill. 2d 161, 167 (1988) ("The court is obligated in marital dissolution proceedings to protect the best interests of the children involved."). This policy is reflected throughout the Act. Among the Act's purposes identified by the General Assembly are mitigating potential harm to children caused by the process of dissolving a marriage and making "reasonable provision for spouses and minor children during and after litigation." 750 ILCS 5/102(4), (5) (West 2012). A court must determine custody in accordance with the best interests of the child (750 ILCS 5/602(a) (West 2012)), and must ensure that the child is supported in accordance with guidelines established by the legislature, or else explain why departure from those guidelines is in the best interests of the child (750 ILCS 5/505(a)(2) (West 2012)). Any postdecree modification of child support, custody, or visitation likewise must serve the best interests of the children. *Blisset*, 123 Ill. 2d at 168.

¶ 36    Further, although the Act seeks to "promote the amicable settlement of disputes" between the parties to a marriage (750 ILCS 5/102(3) (West 2012)) and expressly encourages the use of marital settlement agreements, the terms of such agreements that affect child support, custody, and visitation are subject to court oversight and must be approved by the court in order to be enforceable (750 ILCS 5/502(b) (West 2012)). Parents "are not at liberty to make agreements which affect the interests of their children without obtaining the approval of the court." *In re Marriage of Ingram*, 259 Ill. App. 3d 685, 689 (1994); see also *Blisset*, 123 Ill. 2d at 168 ("Parties may not bargain away their children's interests."). In addition, parties may not make the child-related terms of their agreements nonmodifiable. "[A]lthough the parties to a dissolution judgment may agree to the terms that relate to the custody, support,

and visitation of their children, so long as those terms meet with the court's approval, they may not circumvent the court's authority to determine later whether the best interests of the children *** require changing any of those terms." *Rife*, 376 Ill. App. 3d at 1064.

¶ 37 The PNA violates these principles in several respects. It gives Hammouda sole power to determine which parent will have custody of the children, because he has sole power to declare whether a party seeking a divorce is doing so "reasonably" or "unreasonably" (paragraph 9) and also is the sole arbiter of whether either party has violated a provision of the PNA such that he or she should forfeit any claim to custody (paragraph 27). Although Hammouda promised to act in accordance with "Islamic Law, including the Holy Quran and Sunnah, to the best of his understanding" (paragraph 32), under the PNA he has no obligation to act in the best interests of the children. Moreover, even if he had undertaken to act in the best interests of the children, neither he nor the parties may substitute their judgment in this regard for the judgment of the court, which must approve any custody arrangement agreed upon by the parties. *Rife*, 376 Ill. App. 3d at 1064. We also note that, under paragraph 27 of the PNA, Hammouda's judgment is intended to be binding and final, without recourse to review by any court. Indeed, even if both of the parties wished to modify the agreement, they could not do so without Hammouda's approval (see paragraph 31).

¶ 38 Mohammad concedes that the PNA's terms relating to child custody are unenforceable as contrary to public policy. However, he argues that these provisions are severable, and he seeks to enforce only those provisions that relate to property distribution. We cannot accept this argument.

¶ 39 In *Kinkel*, the supreme court approved a standard for applying a severability clause that derives from section 184 of the Restatement (Second) of Contracts. *Kinkel*, 223 Ill. 2d at 47 (citing Restatement (Second) of Contracts § 184 (1981)). Under this standard, "a court may sever the unenforceable portion of an agreement and enforce the remainder" if the party seeking enforcement did not engage in serious misconduct and the unenforceable portion is not essential to the agreement as a whole. *Id.* Here, it is clear that custody of the children was extremely important to both parties: custody was contested vigorously before the trial court and is also at issue in this appeal. Indeed, Mohammad suggests that he entered into the PNA in part so that he could see his children after a three-month separation. Hammouda's control over which party would have custody of the children therefore must be seen as of great importance to the parties, and we conclude that the removal of these terms would change the nature of the parties' overall bargain substantially, to the point that we cannot conclude that without them the parties would have entered into the PNA. Moreover, the issue of custody was intertwined in the PNA with financial issues. Under paragraph 27 of the PNA, Hammouda could decide whether a violation of *any* provision of the PNA–regardless of the provision's subject matter–should result in a party's loss of custody, loss of property rights, or both. As the custody terms were an essential aspect of the PNA and were intertwined with the financial terms, we do not believe that we can apply the severability clause and enforce the remaining provisions of the PNA. *Id.*; see also *People v. Montiel*, 365 Ill. App. 3d 601, 606 (2006) ("agreement as a whole is void if an essential term cannot be performed" (citing *People v. Hare*, 315 Ill. App. 3d 606 (2000))).

¶ 40    Even if we could sever the financial provisions of the PNA from the child-custody provisions, however, we would still find the PNA invalid and unenforceable. As the trial court found, the term "unreasonable divorce," the linchpin upon which the entire agreement turns, is vague, ambiguous, and uncertain. Although the PNA describes an "unreasonable divorce" as one filed without Hammouda's approval, the PNA does not state the circumstances under which he would deem a divorce "unreasonable." A court may consider parol evidence when a term is ambiguous. *West Bend Mutual Insurance Co. v. Talton*, 2013 IL App (2d) 120814, ¶ 19. Here, however, Hammouda's testimony regarding the circumstances under which he would deem a divorce "unreasonable" was likewise vague and ambiguous. Thus, the vagueness and ambiguity were not cured by the parol evidence that was offered.

¶ 41    The PNA is also substantively unconscionable. A contract is substantively unconscionable, and thus unenforceable, where the terms are significantly one-sided or oppressive. *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 777 (2007). Here, the PNA provides that Uzma would forfeit all rights to the largest marital asset, the 925 Iroquois property, if she "unreasonably file[d] for divorce." Significantly, however, the PNA does not impose a similar penalty on Mohammad. Mohammad argues that Uzma's forfeiture of the house was not unconscionable, because there were other marital assets at the time the PNA was executed, such as the parties' burial plots and stock. These two assets were valued at only $12,000, however, far below the value of the house. Mohammad also argues that the parties had about $150,000 in a bank account at the time of the PNA, but the testimony regarding the account only established that it existed in 2011, and there was no evidence of such an account in 2007 when the PNA was signed. *In re Marriage of Niles*, 2011 IL App (2d) 100528, ¶ 13 (substantive unconscionability is determined based upon the parties' economic circumstances immediately following the execution of the agreement). In addition, although the PNA recites that the retitling of the house in both parties' names was the consideration for Uzma giving up her right to maintenance, that retitling had little or no value given the fact that the house was already a marital asset, not Mohammad's nonmarital asset. Finally, the vagueness of the term "unreasonable divorce" further contributes to the substantive unconscionability of the financial terms of the PNA, as it raises the possibility that Uzma could lose her property rights if Hammouda withheld approval of her desire to file for a divorce, even if his actions were whimsical or capricious.

¶ 42    For all of these reasons, we affirm the trial court's determination that the PNA was invalid and unenforceable.

¶ 43        C. Denial of Motion for Appointment of Evaluator Under Section 604.5 of the Act

¶ 44    Mohammad next argues that the trial court erred in denying his motion to appoint a custody evaluator pursuant to section 604.5 of the Act (750 ILCS 5/604.5 (West 2012)). The determination of whether an evaluator should be appointed under section 604.5 is within the broad discretion of the trial court, and we review the court's decision for abuse of that discretion. *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 68 (2009). A trial court abuses its discretion only where its ruling is arbitrary, fanciful or unreasonable or where no reasonable

person would take the view adopted by the trial court (*People v. Anderson*, 367 Ill. App. 3d 653, 664 (2006)), or where its ruling rests on an error of law (*Cable America, Inc. v. Pace Electronics, Inc.*, 396 Ill. App. 3d 15, 24 (2009)).

¶ 45    In this case, the trial court appointed Connie Gessner as guardian *ad litem* (GAL) for the children in August 2012. In December 2012, Mohammad moved for the appointment of Dr. Mary Gardner, a psychologist, as an expert to evaluate Uzma's mental health pursuant to Illinois Supreme Court Rule 215(a) (eff. Mar. 28, 2011). He alleged that Uzma's mental health was at issue due to her "impulsive behavior and anger issues." Uzma denied these allegations, noted that Mohammad had left the children wholly in her care since September 2011 while he was in Saudi Arabia working, and argued that the appointment of an expert custody evaluator under section 604(b) of the Act (750 ILCS 5/604(b) (West 2012)) would be more appropriate. (Section 604(b) permits the trial court to appoint its own expert to provide it with advice regarding custody and visitation.) On January 14, 2013, the trial court appointed Dr. Gardner as a custody evaluator under section 604(b).

¶ 46    Dr. Gardner interviewed the parties and their children, reviewed information about the family from neighbors and relatives suggested by the parties, and reviewed statements that Hammouda made in court filings and during court proceedings. She issued a report on April 8, 2013, in which she concluded that both parties were fit parents who had close bonds with their children. However, in reviewing the factors set out in section 602 of the Act (750 ILCS 5/602 (West 2012)) relating to custody and the best interests of the children, Dr. Gardner found that Uzma had been the primary caregiver for the children and that Mohammad had a negative view of Uzma that was not always supported by the evidence. Dr. Gardner therefore recommended that Uzma receive sole custody of the children, with liberal visitation for Mohammad.

¶ 47    On April 16, 2013, Mohammad filed the motion at issue here, seeking the appointment under section 604.5 of the Act of an expert witness to evaluate custody. Section 604.5 permits the appointment of such an expert, and provides that this expert evaluation "may be in place of or in addition to" an evaluation pursuant to section 604(b). 750 ILCS 5/604.5 (West 2012). In his motion, Mohammad reasserted his claim that there was an issue as to Uzma's mental health, and he asked that Dr. Michael Fields, a psychologist, be appointed to conduct psychological testing of both parents as part of a custody evaluation. Mohammad also noted that the trial court's appointment of Dr. Gardner fell beyond the 18-month deadline for resolving issues of child custody mandated by Illinois Supreme Court Rule 922 (eff. July 1, 2006), although he did not explain how the appointment of another custody evaluator would resolve the custody issue more promptly.

¶ 48    Gessner, the GAL, issued a report on April 24, 2013. (In it, she noted that, after she conducted her initial home study and interviewed the parties and their children during August and September 2012, she had shared her custody recommendation with the parties, but they had asked her not to produce a report to the court at that time so that they could pursue a joint parenting agreement.) She concurred with Dr. Gardner's recommendation. She did not believe that the parties could cooperate well enough for joint custody. As Uzma had been the

primary caregiver and, in Gessner's opinion, was more likely to preserve the noncustodial parent's bond with the children, Gessner recommended granting sole custody to Uzma.

¶ 49    On April 29, 2013, the trial court denied Mohammad's motion for a section 604.5 custody evaluator. However, the court allowed Mohammad to depose Dr. Gardner and to have her tests and records reviewed by Dr. Fields. The court order from that date notes the court's rulings without further explanation. Mohammad did not include in the record on appeal a transcript of the proceedings from that date.

¶ 50    Mohammad deposed Dr. Gardner prior to trial and retained Dr. Fields as his own expert witness. Dr. Fields issued a report criticizing Dr. Gardner's methodology, in that she conducted only one psychological test, the Minnesota Multiphasic Personality Inventory, of the parties and did not interview either Hammouda or Mohammad's son from his first marriage. At trial, Mohammad cross-examined Dr. Gardner on these and other issues, and presented testimony by Dr. Fields that criticized Dr. Gardner's methods and conclusions. Mohammad also presented the testimony of his son from his first marriage, and also of other family members, concerning the parties' past conduct and fitness as parents.

¶ 51    On appeal, Mohammad argues that the trial court abused its discretion in denying his request to appoint Dr. Fields as a section 604.5 custody evaluator, because his request was made promptly and Dr. Gardner's report was incomplete and contained errors. We cannot assess this issue, however, because the record on appeal is incomplete: Mohammad did not include any transcript of the hearing at which the trial court denied his motion. In any appeal, it is the responsibility of the appellant to supply a complete record sufficient to permit review of the issues he wishes to raise on appeal. *In re Application of the County Treasurer & ex officio County Collector*, 373 Ill. App. 3d 679, 684 n.4 (2007). In the absence of such a record, we must presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Koppel v. Michael*, 374 Ill. App. 3d 998, 1008 (2007) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)).

¶ 52    Moreover, even if we had the necessary record before us, Mohammad has forfeited his primary argument on appeal–that a second custody evaluation was needed because Dr. Gardner's report was incomplete and contained errors–because he never raised this argument in his motion before the trial court. See *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010) ("A reviewing court will not consider arguments not presented to the trial court."). As to his argument that he did not delay in filing his motion, mere promptness in filing a motion does not provide a reason to overturn a trial court's exercise of its discretion in denying that motion. Here, where the trial court allowed Mohammad to present extensive evidence regarding the alleged errors in Dr. Gardner's report through the trial testimony of Dr. Fields and other witnesses, we find no abuse of that discretion.

¶ 53                        D. Grant of Sole Custody to Uzma

¶ 54    In his remaining arguments on appeal, Mohammad attacks the trial court's rulings in the judgment for dissolution, arguing that it erred in: granting Uzma sole custody of the children; finding that Uzma was entitled to maintenance (even if it did not actually award her any

- 13 -

current maintenance); and awarding Uzma the majority of the marital estate. We begin with the argument that the trial court should not have granted Uzma sole custody of the children.

¶ 55 Child custody determinations are governed by section 602 of the Act (750 ILCS 5/602 (West 2012)). That section provides that custody must be determined "in accordance with the best interest of the child" and by considering all relevant factors, including the 10 factors listed in the statute. 750 ILCS 5/602(a) (West 2012). A trial court's determination regarding custody is given great deference because that court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child. *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 33. We will not reverse that determination on appeal unless "it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. [Citation.] A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55.

¶ 56 Mohammad argues that the evidence showed that he was a loving father who had a close relationship with his children and that the trial court thus should have awarded him and Uzma joint custody. However, in order to award joint custody, a trial court must find that the parties are able to "cooperate effectively and consistently" with each other in matters relating to the parenting of the children. 750 ILCS 5/602.1(c) (West 2012). Mohammad has not rebutted Gessner's and Dr. Gardner's opinions that the parties' level of conflict with each other was too high to permit joint custody. Accordingly, he has not shown that the trial court's decision that joint custody was not appropriate was against the manifest weight of the evidence.

¶ 57 Mohammad also argues that Uzma interfered with his ability to visit the children during his trips to Illinois while he was working in Saudi Arabia and thus should not have sole custody. However, the trial court's judgment contains detailed findings regarding each of the 10 statutory factors, with citations to the evidence regarding each factor. As to the willingness of each parent to facilitate a "close and continuing relationship" between the children and the other parent (see 750 ILCS 5/602(a)(8) (West 2012)), the trial court specifically found that Mohammad would be the parent more likely to interfere with that relationship. This finding was based on Gessner's and Dr. Gardner's observations that Mohammad spoke negatively and disrespectfully of Uzma, as well as on the trial court's own observations of Mohammad. In addition, both Gessner and Dr. Gardner investigated Mohammad's claims of interference with visitation, and they opined that Uzma had not interfered but instead had made good-faith efforts to provide Mohammad with visitation, often on short notice. Accordingly, the trial court's grant of sole custody to Uzma was not against the manifest weight of the evidence.

¶ 58 E. Finding That Uzma Was Entitled to Maintenance

¶ 59 Mohammad next argues that the trial court erred in finding that Uzma was entitled to maintenance (although it did not set any current maintenance obligation). Section 504 of the Act governs the determination of whether maintenance is appropriate, and it contains 12 enumerated factors for the court to consider. 750 ILCS 5/504 (West 2012). Those factors

- 14 -

include: the income and property of each party; the needs of each party; the present and future earning capacity of each party; any impairment of the present and future earning capacity of the recipient spouse due to devoting time to domestic duties or forgoing opportunities because of the marriage; the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment; the standard of living established during the marriage; the duration of the marriage; the age and physical and emotional condition of each party; the tax consequences of the property division; any contribution and services by the recipient spouse to the other spouse; any valid agreement of the parties; and any other factor that the trial court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2012). A court is not limited to the enumerated factors in reaching an equitable determination, and no one factor is dispositive. *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 10. The granting of maintenance is within the trial court's discretion, and we will not reverse the trial court's determination unless it is clear that it has abused that discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). The party challenging the award of maintenance bears the burden of showing such an abuse of discretion. *Id.*

¶ 60    Mohammad argues that the trial court should not have found that Uzma was entitled to maintenance because none of the enumerated factors favors a grant of maintenance. However, applying the factors to the evidence reveals that this argument clearly lacks merit. Uzma is in her forties, was married for over 10 years, and forwent employment during the marriage to stay home and care for the parties' children. The parties enjoyed a high standard of living while in Saudi Arabia, and they also appear to have been relatively comfortable when living in Illinois, albeit at a more middle-class standard of living. Due to her lack of credentials in this country and the need for additional education and certification, however, Uzma is not currently employable at a salary that would permit her to support the children and enjoy the same standard of living as during the marriage. Moreover, the slightly higher proportion of marital assets awarded to her will not cure the shortfall between her earning capacity and her household expenses. See *In re Marriage of Gurda*, 304 Ill. App. 3d 1019, 1028 (1999) (maintenance may be appropriate despite award of marital property; recipient spouse should not be required to liquidate assets in order to meet living expenses).

¶ 61    Mohammad insists that the parties essentially have the same low earning capacity because, like Uzma, he cannot find work in Illinois that would permit him to maintain the parties' former standard of living. He also asserts that his needs are equal to Uzma's. However, the trial court found that Mohammad is currently underemployed and that he voluntarily left his most recent position, at which he was earning a high salary. The trial court also stated that, given his experience, skill level, and wage history, it expected that Mohammad would soon be able to find employment at a higher salary. His situation thus differs from Uzma's, as she requires additional training before she will become employable in her field. Moreover, Uzma's needs are greater, as she is the custodial parent, with the responsibility for meeting the children's daily needs. Although Mohammad introduced evidence that he had recently signed a lease to rent a house at $2,200 per month (so that he could care for the children if he were granted custody), at the time of trial he was living rent-free in his brother's home and was being supported by his brother, and thus he had

minimal living expenses. Accordingly, we find no abuse of discretion in the trial court's determination that Uzma was entitled to maintenance.

¶ 62                               F. Distribution of Marital Property

¶ 63        Mohammad lastly asserts that the trial court abused its discretion in awarding the majority of the marital estate to Uzma. A trial court has broad discretion in the division of marital assets, and we will reverse its determinations only if it is clear that the trial court has abused that discretion. *Wojcik*, 362 Ill. App. 3d at 161.

¶ 64        In the judgment for dissolution, the trial court ordered the property at 925 Iroquois to be sold and awarded Uzma 65% of the proceeds. The trial court treated as an asset (in essence, an account receivable) the $52,000 still owed to the parties by Mohammad's sister and brother-in-law from the back-and-forth transfer of their condominium. The trial court awarded the full amount of this asset to Mohammad, but ordered him to pay Uzma $33,800 (65% of $52,000) from his share of the proceeds when the 925 Iroquois property was sold. As to other assets, the stock was to be sold and the proceeds evenly divided. Each party was awarded his or her own bank accounts and was liable for his or her own attorney fees. All of the marital debt was assigned to Mohammad: this included $8,625 owed to various entities in connection with Mohammad's employment in Saudi Arabia, and $44,260 allegedly owed to Mohammad's sister and brother-in-law for rent, utilities, maintenance, and the like while Uzma and the children were residing in the condominium.

¶ 65        In announcing its rulings, the trial court stated that it was awarding a larger portion of the marital property to Uzma because, although she was entitled to receive maintenance, Mohammad's current low income prevented the court from awarding any amount of maintenance, at least until Mohammad obtained employment "commensurate with his experience." The trial court noted that Mohammad's underemployment and low income also resulted in an unreasonably low amount of child support (under the statutory guidelines) that was insufficient to meet the children's needs. The disproportionate property award to Uzma, the custodial parent, was intended to address this shortfall at least in part.

¶ 66        As in his arguments regarding maintenance, Mohammad argues that the parties are in the same financial position "because neither party is employable in their field without further education or experience," and that he contributed $60,000 of nonmarital funds to the 925 Iroquois property. We note that Mohammad did not request reimbursement for his nonmarital contribution to a marital asset, nor did he present any evidence tracing that contribution, as would be required for reimbursement under section 503(c)(2) of the Act (750 ILCS 5/503(c)(2) (West 2012)). Rather, he simply advances his contribution as a reason that he should have been awarded a larger share of the proceeds from the sale of the property. See 750 ILCS 5/503(d)(1) (West 2012) (the contribution of each party to the acquisition and preservation of an asset is one factor to be considered in dividing marital assets).

¶ 67        As to the first argument, we have rejected it in our analysis of maintenance, above, and we likewise reject it here. As to the second argument, the parties' relative contributions to marital assets are but one factor among a dozen factors enumerated in section 503(d), and

Mohammad does not argue that the balance of the factors favors him. Accordingly, the trial court did not abuse its discretion in dividing the marital estate as it did.

¶ 68                                III. CONCLUSION

¶ 69    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 70        Affirmed.


¶ 71        PRESIDING JUSTICE BURKE, specially concurring.

¶ 72        I agree with the analysis in the majority opinion with the exception of the discussion of severability in paragraph 39.

¶ 73        In this case, the PNA contained an express severability clause, which weighs in favor of enforcing various provisions of the agreement after unenforceable provisions are removed. See *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 52 ("A contractual severability clause 'strengthens the case for the severance of unenforceable provisions because it indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions.' [Citation.]").

¶ 74        The PNA contained three separate paragraphs related to the parties' agreed disposition of issues in a divorce setting. Paragraph 1 concerned the distribution of equity in the home. Paragraph 9 concerned child custody. Paragraph 28 concerned waiver of spousal support. While paragraph 9 is clearly unenforceable as against public policy, I simply do not see how this provision is so intertwined with the financial issues as to defeat the stated intent of the parties regarding severability.

¶ 75        That said, I wholeheartedly agree with the majority that the PNA was unenforceable in its entirety (including the severability clause) as it was vague, ambiguous, and substantively unconscionable.