2021 IL App (2d) 200356-U
No. 2-20-0356
Order filed July 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| ERIC HAENISCH, | ) | of Kane County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 19-D-1184 |
| | ) | |
| KERRY A. HAENISCH, | ) | Honorable |
| | ) | William J. Parkhurst, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the court found a post-nuptial agreement to be enforceable, no additional finding regarding conscionability was required. Further, respondent did not meet her burden of proving that the post-nuptial agreement was substantively unconscionable where the agreement placed burdens on both parties and was not so one-sided, oppressive, or harsh as to render it unconscionable.

¶ 2    Following an evidentiary hearing, the trial court denied respondent's, Kerry Haenisch's, petition to declare a post-nuptial agreement (PNA) unconscionable and void. Kerry timely appealed. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4    Petitioner, Eric Haenisch, married Kerry on June 9, 2012. No children were born of the marriage. Eric and Kerry filed and dismissed dissolution-of-marriage actions against one another. On February 18, 2019, Kerry and Eric signed a PNA.[1] The relevant terms are summarized as follows. In the event of a divorce, all marital assets and debts would be divided equally. Kerry would receive half of the marital portion of Eric's pension and retirement benefits that accrued from June 1, 2012, through September 30, 2018. Both parties waived maintenance. All legal fees incurred as a result of either party filing for divorce on or before December 31, 2025, would be divided equally. The PNA would automatically terminate on January 1, 2026, if the parties remained married. On October 1, 2019, Eric filed the instant petition for dissolution of marriage. Kerry filed a counterpetition for dissolution of marriage on October 18, 2019. Kerry subsequently filed a petition to declare the PNA unconscionable and void. The following pertinent evidence was adduced at the hearing on Kerry's petition.

¶ 5                              A. Eric's Testimony

¶ 6    Eric testified that he was 47 years old in February 2019 and was employed as an electrician, earning $100,000 annually. Kerry was unemployed and had a history of alcohol abuse. On February 18, 2019, the parties signed the PNA. Eric testified that, between car loans and credit cards, he was about $100,000 in debt when they signed the PNA. Eric testified that his retirement benefits were worth about $90,000. Prior to the execution of the PNA and the voluntary dismissal of a prior petition for dissolution of marriage, Eric paid Kerry $2200 per month as temporary maintenance. According to Eric, if the PNA were to go into effect, Kerry would assume

---

[1] The PNA did not indicate the amount of Eric's pension and retirement benefits, temporary maintenance, or marital assets and debt, nor were any exhibits attached to the PNA.

approximately $50,000 of debt, and gain approximately $45,000 of Eric's retirement benefits, while receiving no maintenance. When Kerry's counsel reminded Eric that Kerry would walk away with debt, Eric replied: "That's on her." Eric testified that Kerry was dishonest. He chose January 1, 2026, as the termination date for the PNA because Kerry lied to him for the first six years of the marriage. Thus, Eric explained that, if he and Kerry could remain married for six more years, "we [would] live happily ever after."

¶ 7                                  B. Kerry's Testimony

¶ 8      Kerry testified that she was 47 years old and unemployed when she signed the PNA. She had struggled with alcohol and had lied to Eric in the past. Kerry had been unemployed since 2016, after she quit her job at a law firm to enter a 30-day rehabilitation program. Financial documents entered into evidence indicated that, in the past eight years, the most that Kerry had earned in any year was $27,323.45, in 2015. In 2019, Kerry earned $279.30. Kerry attributed the drop in income to her struggle with alcohol. Kerry testified that, when she signed the PNA, she had roughly $11,000 of credit card debt and owed $18,000 on a car loan. Kerry explained that she and Eric had a handful of in-person discussions about the PNA. However, anything she tried to negotiate with Eric fell upon "deaf ears." Kerry contacted her former attorney before she signed the PNA. He advised her not to sign the PNA until he looked at it. Kerry signed it anyway. She signed the PNA because she wanted her marriage to work. Kerry testified that she was sober and had not consumed alcohol in years. She was certified as a paralegal and could make $17.00 to $24.00 per hour in that capacity. There was nothing preventing her from full-time employment, other than the lack of a job offer.

¶ 9                                  C. The Trial Court's Ruling

¶ 10    After the hearing, the trial court reviewed the impact of the PNA. In its thorough ruling, the trial court denied Kerry's petition. The court said that Kerry, who it found to be smart, eloquent, and a good advocate for herself, tried to negotiate the terms of the PNA. Kerry had the advice of counsel, which she chose to disregard. Even though Kerry would be walking away with less under the PNA than the law would give her without it, it was "not nothing." The court noted that, if the marriage continued, the PNA offered Kerry the opportunity to end up in a "very favorable financial circumstance in the future." The court explained that "I don't think we can say *** this was unconscionable because it's a bad result." This was a choice that Kerry made to sign the PNA. The court further explained that the issue is not "whether *** this was unconscionable *** [;] I think the issue is: Is it enforceable?" Finally, the court concluded it would be insulting of her intelligence not to hold her to the PNA. Kerry timely appealed.

¶ 11                                    II. ANALYSIS

¶ 12    We will first address Kerry's contention that the trial court did not rule on the unconscionability of the PNA as required by statute. We will then address Kerry's argument that the PNA is substantively unconscionable.

¶ 13                           A. The Trial Court's Ruling

¶ 14    Even though the trial court heard testimony on Kerry's petition and subsequently denied it, Kerry claims that the court did not actually rule on whether the PNA was unconscionable. Kerry argues that the trial court ruled only on enforceability, not unconscionability. To support this assertion, Kerry cites the portion of the court's ruling in which it explained: "I don't think the issue is whether or not this was unconscionable, as we sit here today. I think the issue is: Is it enforceable?" Kerry maintains that, pursuant to the plain language of section 502(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/502(b) (West 2018)), a court must

determine whether the PNA is unconscionable before considering whether it is enforceable. Kerry claims that, because the trial court did not rule on unconscionability before it ruled on the enforceability of the PNA, the court's ruling should be reversed.

¶ 15    Eric responds that, pursuant to the Act, the PNA is binding on the court unless the court finds it to be unconscionable. Therefore, Eric argues, where the court determined that the facts and the evidence did not establish unconscionability, no finding with respect to conscionability was required. Eric also notes that Kerry does not cite any authority to support her interpretation of section 502(b) of the Act. 750 ILCS 5/502(b) (West 2018). Eric maintains that the court's ruling and order were consistent with statutory requirements.

¶ 16    Section 502(a) of the Act authorizes parties to enter into a PNA. 750 ILCS 5/502(a) (West 2018). Section 502(b) of the Act furnishes the standard by which a court reviews the terms of a PNA. 750 ILCS 5/502(b) (West 2018). The statute provides that "The terms of the agreement *** are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties *** that the agreement is unconscionable." 750 ILCS 5/502(b) (West 2018). Statutory construction is a question of law subject to *de novo* review. *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 282 (2006). "When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent, best indicated by the plain and ordinary language of the statute." *Hernandez v. Lifeline Ambulance, LLC*, 2019 IL App (1st) 180696, ¶ 10 (quoting *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 25). We are not at liberty to depart from the plain language of a statute by reading into it exceptions, conditions, or limitations that the legislature did not express. *In re N.C.*, 2014 IL 116532, ¶ 50.

¶ 17     Here, by its plain language, the statute instructs that an agreement is binding on the court unless the court finds it to be unconscionable. Thus, unconscionability is an exception to the general presumption that a PNA is binding on the court. Contrary to Kerry's contention, where the court finds a PNA to be enforceable, no additional finding regarding conscionability is required. See *In re Marriage of Hightower,* 358 Ill. App. 3d 165, 171 (2005) (explaining that "[a]greements regarding the disposition of property and maintenance are binding upon the court unless they are found to be unconscionable."). Moreover, here, the trial court heard and denied Kerry's petition to declare the PNA unconscionable and void noting that "I don't think we can say *** this was unconscionable because it's a bad result." Consequently, Kerry's argument that the court refused to address the issue of whether the PNA was unconscionable is without merit.

¶ 18                    B. The PNA Is Not Substantively Unconscionable

¶ 19     We next examine whether the PNA is substantively unconscionable. "A contract is substantively unconscionable, and thus unenforceable, where the terms are significantly one-sided or oppressive." *In re Marriage of Iqbal*, 2014 IL App (2d) 131306, ¶ 41. Kerry argues that the court did not properly consider the parties' respective financial situations immediately following the execution of the PNA. Instead, Kerry maintains, the trial court improperly considered her "opportunity to end up in a very favorable financial circumstance in the future." Kerry argues that, had the court considered the economic positions of the parties immediately following the creation of the PNA, it would have found the PNA to be substantively unconscionable. On this point, Kerry emphasizes that (1) she was 47 years old and unemployed for almost three years leading up to the signing of the PNA, (2) she had a history of alcohol abuse, and (3) she could potentially walk away with nothing if the PNA went into effect. Kerry requests reversal of the trial court's order denying her petition.

¶ 20    Eric responds that, even if Kerry will receive less under the PNA than she otherwise would be entitled to under Illinois law, this does not render the PNA unconscionable. Eric notes that, although the PNA calls for Kerry to incur half of Eric's debt and attorney fees, it also calls for Eric to incur half of Kerry's debt and attorney fees. Eric points out that the parties would split the marital assets in half, which would include Eric's pension and retirement benefits, valued at approximately $90,000. Eric also mentions that Kerry is now sober and that she testified that the only thing standing between her and a full-time paralegal job was an offer. Thus, he argues, the PNA is not substantively unconscionable.

¶ 21    An agreement that merely favors one party over another is not unconscionable. *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 41. A court evaluates conscionability by looking to the parties' "relative economic positions immediately following the making of the agreement." (Emphasis omitted.) *In re Marriage of Nilles*, 2011 IL App (2d) 100528, ¶ 13. The burden of proving that a provision of a contract is unconscionable is upon the party alleging unconscionability. *Zobrist v. Verizon Wireless*, 354 Ill. App. 3d 1139, 1149 (2004). "We review *de novo* the trial court's determinations with respect to the PNA." *Iqbal*, 2014 IL App (2d) 131306, ¶ 33.

¶ 22    Here, Kerry did not meet her burden of proving that the PNA was unconscionable. She argues that the trial court erroneously considered the parties' future potential economic circumstances. Here it is clear the court considered the parties' circumstances after making the agreement. But, even if the trial court also improperly considered the parties' future potential economic circumstances, we cannot say that the PNA was so one-sided or harsh as to be considered unconscionable. Under the PNA, the parties agreed to split all marital assets and debts in half. They also agreed to split equally any legal fees arising from any divorce action filed before the

PNA terminated. This means that, not only would Kerry be responsible for half of Eric's debts and attorney fees, but Eric would also be responsible for half of Kerry's debts and attorney fees. Further, despite being unemployed when she signed the PNA, Kerry would receive approximately six years' worth of Eric's accrued retirement benefits. Even though both parties agreed to waive maintenance it is well recognized that such a provision does not invalidate a PNA. See *Berger v. Berger*, 357 Ill. App. 3d 651, 656 (2005) (explaining that "[a]lthough maintenance waivers are disfavored in Illinois, a waiver will be enforced if it was given in exchange for significant financial consideration."). Moreover, Kerry testified that she was sober and ready to accept full-time employment. Under these circumstances, the PNA places burdens on both parties and is not so harsh or one-sided as to be unconscionable.

¶ 23     The facts here are distinguishable from other cases where courts have deemed PNAs substantively unconscionable. In *Iqbal*, the PNA provided that the wife would forfeit her rights in the largest marital asset if she "unreasonably file[d] for divorce." *Iqbal*, 2014 IL App (2d) 131306, ¶ 41. The PNA did not provide for a similar penalty for the husband. *Iqbal*, 2014 IL App (2d) 131306, ¶ 41. Further, even though the value of other marital assets was $12,000, that was far below the $350,000 value of the largest marital asset. *Iqbal*, 2014 IL App (2d) 131306, ¶¶ 6, 41. The PNA also provided that the wife waived maintenance for what the court reasoned was consideration worth either nothing or very little. *Iqbal*, 2014 IL App (2d) 131306, ¶ 41. Here, unlike in *Iqbal*, Kerry would be entitled to half of Eric's retirement benefits, presumably the largest marital asset, valued at $45,000. Moreover, both parties assumed half of each other's debts, and they agreed to split any future potential legal fees. Even though Kerry agreed to waive maintenance, she testified that she was sober and able to work full-time as a paralegal. Consequently, we determine that Kerry did not meet her burden of proving that the PNA was so

one-sided, oppressive, or harsh as to render it unconscionable. To rule otherwise would serve to vitiate the parties' freedom to contract. See *In re Estate of Holms*, 2019 IL App (2d) 190139, ¶ 22 (explaining that a husband and wife are free to enter into a separation agreement).

¶ 24 Thus, we affirm the trial court's denial of Kerry's petition to declare the PNA unconscionable and void.

¶ 25 III. CONCLUSION

¶ 26 For the foregoing reasons, we affirm.

¶ 27 Affirmed.