2016 IL App (3d) 140946

Opinion filed August 2, 2016
_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| ROY ZENERE TRUCKING & EXCAVATING, INC., OAK LAWN BLACKTOP PAVING COMPANY, INC., and ALPINE CONCRETE, INC., | ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| BUILD TECH, INC., JEFFERSON REGER DEVELOPMENT, LLC, NATIONAL CITY BANK COMPANY, WALGREENS COMPANY, UNKNOWN OWNERS and NONRECORD CLAIMANTS, JEFFERSON REGER, LLC, BUILD TECH, INC., HEALEY COURT APARTMENTS, LLC, JOHN STREET APARTMENTS, LLC, and BUSEY BANK, | ) ) ) ) ) ) ) ) ) ) ) | Appeal No. 3-14-0946 Circuit Nos. 08-CH-4701, 09-CH-875, and 09-AR-636 |
| Defendants. | ) ) | |
| (Oak Lawn Blacktop Paving Company, Inc. and Alpine Concrete, Inc., Plaintiffs-Appellees and Cross-Appellants; Jefferson Reger, LLC, Build Tech, Inc., Healey Court Apartments, LLC, John Street Apartments, LLC, and Busey Bank, Defendants-Appellants and Cross-Appellees). | ) ) ) ) ) ) ) ) ) ) | Honorable Raymond E. Rossie, Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Schmidt and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1       Defendant, Jefferson Reger, LLC, appeals the trial court's finding in favor of plaintiffs, Oak Lawn Blacktop Paving Company, Inc. (Oak Lawn) and Alpine Concrete, Inc. (Alpine) for the balance of the subcontracts underlying their mechanics liens and denying defendant's counterclaims for constructive fraud and slander of title. Plaintiffs cross-appeal from the trial court's denial of attorney fees. We affirm in part, reverse in part, and remand for calculation and imposition of attorney fees.

¶ 2       FACTS

¶ 3       Defendant owned a parcel of real estate in Shorewood, Illinois. Defendant planned to develop the property and lease it for the operation of a Walgreens store. In November 2007, defendant entered into a general contract with codefendant, Build Tech, Inc. (Build Tech), to build the Walgreens store on the property. Build Tech subsequently entered into subcontracts with plaintiffs. Disputes arose between defendant and Build Tech and with several of the subcontractors. The disputes between defendant and Build Tech and all subcontractors other than plaintiffs were settled before trial. Plaintiffs asserted mechanics lien foreclosure claims against defendant.

¶ 4       In 2009, plaintiffs each filed separate complaints against each defendant asserting mechanics lien foreclosure claims. Alpine's complaint alleged that Alpine and Build Tech entered into a subcontract on January 8, 2008. The subcontract required Alpine to perform concrete work, for which Alpine would be paid $217,752, which equaled the subcontract price of $208,000 plus extras. Alpine completed the obligations on September 14, 2008, that $30,522

remained unpaid, and that a lien was placed on the property on November 25, 2008. Oak Lawn's complaint alleged that Oak Lawn and Build Tech entered into a written subcontract on April 24, 2008, under which Oak Lawn would perform paving work around the Walgreens store and be paid a subcontract price of $112,800 plus extras. Oak Lawn completed the work on September 16, 2008, at which time $36,655 remained owing to Oak Lawn. Oak Lawn then placed a lien on the property on November 26, 2008.

¶ 5        Defendant filed counterclaims against plaintiffs alleging constructive fraud and slander of title stating that plaintiffs knowingly overstated their lien claims, as they were based on unsigned change orders.

¶ 6        The case proceeded to trial. Kevin Reger testified that he was "the sole member-manager of Jefferson Reger, LLC." Defendant entered into a written general contract with Build Tech on November 5, 2007. Build Tech hired subcontractors to do the project, two of which were plaintiffs. Reger said he became aware that plaintiffs were hired as subcontractors through the general contractor's sworn statement and through lien waivers provided by plaintiffs. However, he never looked at any of the subcontractors' contracts prior to starting the job, and he did not believe he saw the contracts "until [they] got to the discovery portion of this lawsuit."

¶ 7        Reger said he received both of plaintiffs' partial lien waivers at the end of September or October. He said the waivers came as backup to the general contractor's sworn statement, so he looked at the sworn statement before looking at the lien waivers. Reger testified that the normal course of business was that he would receive a pay application asking for a certain amount of money, then underlying that would be the sworn statement to verify the numbers, and then the lien waivers would further solidify the numbers. Reger explained that he received four rounds of pay applications and sworn statements. He stated he would look at the pay application, which

3

would state the amount of the contract, the amount of the change orders, the amount to be paid, and the retainage. He would then look at the underlying sworn statement from the contractor. The sworn statement listed each subcontractor, the scope of their work, the amount of the subcontractor's contract, the retention amount, the net previously paid, the amount of the current payment, and the balance to completion. After he received the contractor's sworn statement, he prepared an owner's sworn statement and submitted all of those documents to the title company. The subcontractors would then bring the lien waivers to the title company, and the title company would disperse a check to the subcontractors. Both plaintiffs received partial payments in this manner.

¶ 8        Based on the third pay application submitted for work ending July 21, 2008, Reger believed that both plaintiffs had fully completed their work on the project as of that date, as the balance of each subcontract and the 10% retention were listed as the same amount.

¶ 9        Reger was shown Oak Lawn's lien waiver. He stated that the lien waiver listed the contract price as $95,500 and each of the contractor's sworn statements listed it as $95,000; therefore, there was a discrepancy of $500 between the documents. He interpreted that to mean that the contract price, including extras, for Oak Lawn was $95,000. Reger became aware after the lawsuit began that Oak Lawn claimed the subcontract was for $112,800. He said that Oak Lawn did nothing to make defendant believe that it intended to discount its subcontract in exchange for partial payment. Reger said that a subcontract between Build Tech and Oak Lawn that listed the contract amount as $95,000 was never produced. Reger stated that he did not know where the amount of $95,000 came from, but he relied on the contractor's sworn statement. Alpine's lien waiver listed its subcontract price as $208,000. Reger stated he interpreted this to

4

mean that was the subcontract price including extras. Reger said if the numbers did not match up between the documents, he would have discussed it with the general contractor.

¶ 10    Reger became aware that plaintiffs had some change orders on the project through discovery; he did not see any change orders until after the lawsuit began. He did not recall whether he approved any change orders for either plaintiff.

¶ 11    Reger agreed that he never paid the full balance of either subcontract and did not pay any extras. Enough money to more than cover the retention (the difference between the subcontract amounts and the partial payments) on each subcontract was put into escrow, but the money was never released to either plaintiff. Reger stated this was because the plaintiffs never submitted final lien waivers. He had no evidence that demonstrated that plaintiffs' work was substandard.

¶ 12    Reger discussed the effect of an overstated lien claim, stating that it impaired the title and salability of the property, his reputation, his relationship with other general contractors and subcontractors, and his ability to obtain good pricing on future projects. Reger admitted that he was able to sell the property. He found a buyer through a man who had previously worked for him, but the negotiation was difficult as he had to convince the buyer to trust him.

¶ 13    Craig Marchbank testified that he was the owner of Oak Lawn and worked on the Walgreens project. The price on the contract was $112,800, but Oak Lawn only received $85,500. Marchbank testified that Oak Lawn performed all the work "[a]bove and beyond" what was set out in the contract without any defects.

¶ 14    Marchbank said that he submitted some change orders. His practice in submitting the change orders was to talk to the general contractor and explain the necessity of the change order. Marchbank submitted the change orders to Jess Funston at Build Tech. Funston signed the change orders, and Marchbank believed that the extra charges were approved and that he should

5

proceed with the additional work. Marchbank sent an invoice for the extras to Build Tech. No one from Build Tech told him defendant's position regarding the change order. Marchbank believed that he made all the claims for extras within seven days and that all of the requests happened by the time he submitted the invoices, as required under the subcontract. Marchbank admitted that the change orders did not say approved and there was nothing written in the blank area that said date accepted.

¶ 15 Marchbank testified that Oak Lawn prepared a subcontractor's lien for $36,655, which included the subcontract amount of $112,800 minus the $85,500 already paid, which equaled $27,300. Marchbank then added the amount of the change orders. The lien was recorded on November 26, 2008. When asked when the work on the project was completed, Marchbank said, "If we looked at your—my sheets again, it would be probably a day or so after that. *** Or weeks after that." He then said Oak Lawn incorporated the date into the mechanics lien, and it was September 16, 2008. To complete work on the project on September 16, they "would have restriped or asked anything else that would have needed to be done. Sometimes straightening up a sign, whatever it would take to fulfill [their] contract."

¶ 16 A notice of lien was sent to defendant in care of its attorney. Defendant's attorney then stated, "If you're raising an issue about whether we received the lien, we don't need to. *** We are not objecting that we didn't receive the lien." Plaintiffs' attorney said that he thought it was one of the affirmative defenses, to which defendant's attorney replied, "No, I don't believe so. Proper notice? No, we don't. We're not objecting." The parties then entered a stipulation with regard to notice having been received.

¶ 17 Marchbank stated that Oak Lawn submitted a partial lien waiver on September 22, 2008, six days after Oak Lawn's work on the project was complete. The lien waiver stated the contract

6

price as $95,000, though Marchbank stated the only subcontract Oak Lawn had with Build Tech was for $112,800. The contract price and the balance due were the only incorrect portions of the lien waiver. The middle portion of the lien waiver contained a contractor's affidavit. Marchbank was asked if he signed the affidavit, and he stated, "That's not my signature." Marchbank stated that he believed it was "Helen's signature," his secretary and wife. She also notarized the partial lien waiver. She worked in the office but was not authorized to sign documents, and her work did not involve the contracts. Marchbank stated that he did not know who submitted the partial lien waiver for Oak Lawn. Marchbank believed he found out that the partial lien waiver had been submitted after Oak Lawn filed suit against Build Tech and defendant. He then discovered that the lien waiver stated the contract amount incorrectly and was not signed by him. He did not notify defendant of the clerical error and did not correct the lien claim or send a corrected waiver. Marchbank did cash the check, but he did not know when he received the check that there had been a partial lien waiver submitted. He often received checks without a lien waiver, even for amounts as large as the $85,500 that he received from defendant. He never submitted a final lien waiver and was never notified that the balance of the contract was available to him.

¶ 18    Helen Marchbank stated that in September 2008 she worked in the Oak Lawn office. She had various tasks including downloading plans, doing "a waiver here or there," answering phones, running errands, and notarizing documents. Helen admitted to signing Marchbank's name to documents on occasion. Marchbank never told her to sign his name; she did it without his direction. She would sign waivers if it was something that the other party needed immediately. She remembered receiving a phone call from Build Tech about the contents of the waiver and filled out the waiver while she was talking to Build Tech. Build Tech told her over the phone that the subcontract amount was $95,000, and Helen entered the dollar amount in the

7

blank space on the partial lien waiver. Because Helen did not know where the contracts were kept, she did not try to cross-reference the information that Build Tech gave her, but relied on Build Tech's information. She agreed that she had signed Marchbank's name to the partial lien waiver in this instance and then notarized it. Helen admitted that she submitted the waiver for payment on this project and that she intended someone to rely on the waiver when making payment.

¶ 19    Michael Kinsella testified that in 2008 he was the owner of Alpine and he entered into a subcontract with Build Tech to do concrete work on the Walgreens project. The subcontract was for $208,000. Kinsella submitted change orders to Funston as the plans for the project changed. Funston indicated that the change orders would be approved.

¶ 20    Kinsella said Alpine completed all the work of the subcontract and was never notified that any of the work was defective or deficient. Alpine filed a mechanics lien for $30,522. Kinsella did not remember exactly when Alpine's work on the project was completed. He was shown the lien to refresh his recollection as to when Alpine last did work on the project and then remembered it was September 14, 2008. The lien was recorded on November 25, 2008, and notice was also sent that same day. The parties stipulated to receipt of notice and the claim for lien. Kinsella stated that Alpine received a partial payment on the subcontract of $187,230. The lien included the $20,770 left to be paid on the subcontract and the change orders of $9752 for a total amount of $30,522.

¶ 21    Kinsella stated that he did not remember what work Alpine did between the beginning of August and the beginning of September 2008, but believed that they did "[e]xterior flat work," which included sidewalks and concrete curbs. He could not remember specifically when that work was completed as it "was five and a half years ago" but would have to rely on what was

8

documented. Defendant asked Kinsella if there was something in the documents that would disclose what work was done between August and September, and Kinsella said he did not know. Kinsella stated that he only remembered that he completed the project on September 14.

¶ 22 Kinsella was shown the lien waiver to date, and agreed that he signed it on the two signature lines on September 9 and 10, 2008. He agreed that the lien waiver said "that the total amount of the contract, including extras, *** is $208,000." He further agreed that the term "extras" was defined in the lien waiver as including change orders. However, Kinsella had not included the extras when drafting the partial lien waiver as he had been in discussions with Build Tech about the approval. Kinsella agreed that the subcontract required change orders to be signed for before the work was started. Kinsella said he never submitted a final lien waiver and was never paid in full.

¶ 23 In its decision, the trial court noted that "this case is somewhat unusual in that the work claimed to be done was done, and was done in a workmanlike fashion." The court found in favor of plaintiffs for the balance of the contract amounts. Concerning the Oak Lawn subcontract, the court stated:

> "Testimony was offered that the Lien Waiver in question understated the contract amount by $17,800 and incorrectly stated the balance due as $9,500. [Defendant] was independently put on notice that the proposed waiver of lien contained clerical errors. The contract amount between Build Tech and Oak Lawn Paving was $112,800. Oak Lawn was paid $85,500. Therefore there was and is an unpaid balance of $27,300."

The court further stated that "[a]ny alleged 'forgery' of Mr. Marchbank's signature by [Helen] is not relevant to the claim for lien as there is no causation to any loss to [defendant] by reason

9

thereof." In making this determination, the court said that the mistake was a clerical error made as Helen was in a hurry to present the waiver for fear of nonpayment, that, as office manager, she had implied authority to sign for Marchbank, and that the error should have been known by the owner.

¶ 24    The court also found that the testimony was uncontroverted that Alpine's subcontract was for $208,000 and Alpine was paid $187,230, leaving a balance of $20,770 unpaid. The court found that "the liens were timely filed, served and recorded and that there was a stipulation regarding the notices [sent] by Plaintiffs."

¶ 25    Regarding the change orders, the court stated:

> "Unfortunately, each of the claimants was led down the primrose path with regards to change orders. Undoubtedly there were time shortages to get the various aspects of the project done and each of the claimants dealt primarily with [Jess] Funston of Build Tech. Each claimant may have reasonably believed that the change orders were approved by the owner, but without testimony in support, the terms of the contracts requiring that any change orders to be approved in writing by the owner must prevail. Accordingly, each claimant will not be allowed to assert a claim against the owner for any change order not approved in writing by the owner."

To summarize, Oak Lawn was awarded $27,300, and Alpine was awarded $20,770, including court costs and interest.

¶ 26    The court rejected defendant's claims of constructive fraud and slander of title. In so deciding, the court stated:

10

"[Defendant] aggressively pursued a counterclaim for constructive fraud against both claimants based upon alleged errors in the notices and claims for lien. A lien will not be defeated if the error or overcharge on the part of the person claiming the lien lacks an intent to defraud. In the instant matter, testimony was provided that the extra work was approved. While the court has problems with approving the amount of the extras in the mechanic lien claim against [defendant], it does not necessarily follow that there was not a colorable right to assert such amounts in the notices and claims for lien.

For the same reasons, [that is] the lack of intent of maliciousness, the Court finds there was no slander of title."

¶ 27     The court further denied plaintiffs' request for attorney fees. Defendant appealed, and plaintiffs cross-appealed.

¶ 28                                         ANALYSIS

¶ 29     On appeal, defendant argues that (A) plaintiffs failed to prove entitlement to their liens under the Mechanics Lien Act (Act) (770 ILCS 60/0.01 *et seq*. (West 2008)), (B) the trial court erred in awarding prejudgment interest, and (C) the trial court erred in denying defendant's claims for constructive fraud and slander of title. Upon review, we find that the court's decision in awarding plaintiffs the balance of their subcontracts with costs and interest was not against the manifest weight of the evidence. We further uphold the trial court's denial of defendant's claims for constructive fraud and slander of title, as plaintiffs lacked the intent to defraud.

¶ 30     On cross-appeal, plaintiffs argue that the court erred in denying their motions for attorney fees. As section 17(b) of the Act specifically allows for attorney fees where the owner was "without just cause or right" to withhold paying plaintiffs the full contract price, we hold the

11

court's failure to award attorney fees was an abuse of discretion. 770 ILCS 60/17(b) (West 2008).

¶ 31                                    I. Defendant's Appeal

¶ 32        An appellate court will only reverse the trial court's findings of fact if they are against the manifest weight of the evidence. *Chicago Transparent Products, Inc. v. American National Bank & Trust Co. of Chicago*, 337 Ill. App. 3d 931, 940 (2003). "A fact finder's determination is against the manifest weight of the evidence where, upon reviewing the evidence in the light most favorable to the prevailing party, the opposite conclusion is clearly apparent or the finding is palpably erroneous or arbitrary and unsubstantiated by the evidence." *Id.*

¶ 33                                  A. Mechanics Lien Claims

¶ 34        Defendant contends that plaintiffs failed to prove they are entitled to their liens. Defendant tenders three specific arguments with regard to this claim. First, defendant argues that Oak Lawn failed to prove the date of service of its lien.

¶ 35        The Act requires a subcontractor to serve notice of a mechanics lien claim within 90 days after completing work on the property and, in order for it to be enforceable against other creditors or purchasers, record the lien within four months of completion. 770 ILCS 60/24, 7(a) (West 2008). At trial, plaintiffs' attorney began a line of questioning regarding notice of the lien claim. Defendant's attorney then stated, "If you're raising an issue about whether we received the lien, we don't need to. *** We are not objecting that we didn't receive the lien." Plaintiffs' attorney said he thought it was one of defendant's affirmative defenses, to which defendant's attorney replied, "No, I don't believe so. Proper notice? No, we don't. We're not objecting." The parties then stipulated to notice having been received. Based in part on this stipulation, the court found that the liens were timely filed, served, and recorded.

¶ 36        Defendant now attempts to temper this stipulation, arguing it was only entered as to the fact that the notice was received, not to when it was served. However, defendant knowingly and voluntarily stipulated. Defendant could have narrowed the scope of the stipulation, but, as filed in the record, defendant stipulated that notice was received. Furthermore, as this issue was not raised in the trial court, it is waived, and defendant may not raise the issue for the first time here. See *Chandler v. Doherty*, 299 Ill. App. 3d 797, 806 (1998). Thus, we defer to the trial court's finding with regard to proper notice.

¶ 37        Second, defendant argues that plaintiffs' lien claims were untimely because they did not prove the dates of completion. At trial, both Marchbank and Kinsella testified that the projects were completed on September 16 and September 14, 2008, respectively. These dates were also included in the lien claims. Neither initially recalled the dates at the time of trial but were able to recall after viewing documents. The liens and testimony of Marchbank and Kinsella establish a firm completion date, supporting the trial court's factual finding that the lien claims were timely.

¶ 38        Defendant challenges this finding by asserting that the trial court should have given more weight to the pay applications, contractors' sworn statements from the project, and an invoice sent by Oak Lawn on July 19, 2008. The pay applications and statements, however, were created by Build Tech, without the knowledge of plaintiffs. Plaintiffs would have had no knowledge of the information contained in the documents at the time that they were created or the purported correctness of such information. As to Oak Lawn's July invoice, though it may have been the last invoice Oak Lawn sent, this evidence, standing alone, does not negate the testimony of Marchbank and Kinsella or the dates included in the lien claims. While defendant is critical of plaintiffs for not submitting time cards or work logs, the failure to provide such evidence does not, by itself, render the testimonial and lien claim evidence insufficient.

13

¶ 39 After considering all the evidence, the trial court held that the liens were timely filed and properly served. Taking the record as a whole, we cannot say that the court's decision was against the manifest weight of the evidence.

¶ 40 Last, defendant argues that Oak Lawn's claim can be no more than $9500, which is the difference between the $95,000 listed on the lien waiver and the $85,500 already paid. Defendant's basis for this claim is that Oak Lawn is bound by the statement in its lien waiver stating the subcontract amount as $95,000. The trial court found that the misstatement of the subcontract amount on the lien waiver was a clerical error. See *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 484 (2002) ("When a party challenges a trial court's bench-trial ruling, we defer to the trial court's factual findings unless they are contrary to the manifest weight of the evidence."). We agree. Build Tech called Oak Lawn and told Helen that the lien waiver needed to be sent, and she filled it out while on the phone, using the subcontract price that Build Tech told her. She did not have access to the subcontract to double-check the contract amount. Looking at the totality of the circumstances, we cannot say that it was against the manifest weight of the evidence for the trial court to find that Oak Lawn was entitled to the balance of its subcontract amount as stated in its subcontract.

¶ 41 B. Constructive Fraud and Slander of Title

¶ 42 Next, defendant argues that the trial court erred in finding defendant did not prove its counterclaims for constructive fraud and slander of title, as plaintiffs lacked an intent to defraud or malice. Specifically, defendant challenges the court's finding that plaintiffs lacked an intent to defraud defendant when they included change orders on their lien claims.

¶ 43 1. Constructive Fraud

14

¶ 44        Section 7(a) of the Act states, in pertinent part, "No such lien shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a lien therefor under this Act, unless it shall be shown that such error or overcharge is made with intent to defraud ***." 770 ILCS 60/7(a) (West 2008). "Even under a constructive fraud theory, a lien claim will not be invalidated simply because the claim contains an overstatement. [Citation.] Rather, in most cases, 'the intent to defraud [is] shown by executed documents that on their face overstate the amount due in combination with some other evidence of record from which intent could be inferred.' " (Emphasis omitted.) *Cordeck Sales, Inc. v. Construction Systems, Inc.*, 382 Ill. App. 3d 334, 373 (2008) (quoting *Peter J. Hartmann Co. v. Capitol Bank & Trust Co.*, 353 Ill. App. 3d 700, 708 (2004)). An overstated lien amount, without other evidence of intent to defraud, is insufficient to defeat the lien claim. See *id.*; *Father & Sons Home Improvement II, Inc. v. Stuart*, 2016 IL App (1st) 143666.

¶ 45        Here, the trial court found that plaintiffs lacked the intent to defraud when they overstated their lien amounts. The court stated:

> "In the instant matter, testimony was provided that the extra work was approved. While the court has problems with approving the amount of the extras in the mechanic lien claim against [defendant], it does not necessarily follow that there was not a colorable title to assert such amounts in the notices and claims for lien."

¶ 46        Upon review, we uphold the court's factual finding that both plaintiffs reasonably believed that the change orders were approved. Pursuant to the subcontracts with Build Tech, plaintiffs would approach Funston each time they had unplanned expenses for the project. Funston told plaintiffs to proceed with the work, and change orders were filled out, which were submitted to Funston. Based on Funston's representation that the change orders were approved,

15

plaintiffs continued with the work, making the necessary extra expenditures. We find that the trial court's findings of fact were not against the manifest weight of the evidence and uphold the trial court's denial of defendant's counterclaim for constructive fraud.

¶ 47 Defendant argues that reliance on *Bank of America National Trust & Savings Ass'n v. Zedd Investments, Inc.*, 276 Ill. App. 3d 998 (1995), *Lohmann Golf Designs, Inc. v. Keisler*, 260 Ill. App. 3d 886 (1994), and *Fedco Electric Co. v. Stunkel*, 77 Ill. App. 3d 48 (1979), support its position. *Zedd* and *Keisler* each dealt with cases where the lien claimants intentionally filed multiple liens that created the appearance of an encumbrance on the property that was substantially greater than the amount owed, and *Stunkel* considered a case where the subcontractor intentionally overstated the lien, double-billed, and failed to give credits for payments. *Zedd*, 276 Ill. App. 3d at 1001-02; *Keisler*, 260 Ill. App. 3d at 891-92; *Stunkel*, 77 Ill. App. 3d at 50-51. Each of these situations dealt with actual conduct that established intent to defraud. Here, plaintiffs reasonably believed they were entitled to the amounts stated in their change orders.

¶ 48                                          2. Slander of Title

¶ 49 Applying the above reasoning (*supra* ¶¶ 43-47), we find the trial court correctly denied defendant's counterclaim for slander of title. To prove slander of title, defendant must have proved (1) that plaintiffs made a false and malicious publication, (2) that the publication disparaged defendant's title to the property, and (3) damages. *Chicago Title & Trust Co. v. Levine*, 333 Ill. App. 3d 420, 424 (2002). "To prove malice, a plaintiff must show that the defendant knew that the disparaging statements were false or that the statements were made with reckless disregard of their truth or falsity." *Id.* "[T]he law in Illinois is that if a party has reasonable grounds to believe that he had legal or equitable title or even a claim, then assertion

16

of this claim does not amount to slander of title ***." *Midwest Glass Co. v. Stanford Development Co.*, 34 Ill. App. 3d 130, 135 (1975). Again, we agree with the court's factual finding that defendant failed to establish malice.

¶ 50                                    C. Prejudgment Interest

¶ 51        Defendant further argues that the trial court should not have awarded prejudgment interest. Specifically, defendant argues that the Act only allows interest from the date the payment to the lien claimant is due and that "[b]ased on such substantial overcharging of liens, and the fact that neither plaintiff would budge from taking the entirety of their lien claims, there was no actual amount 'due' from the owner, until the trial court issued its Memorandum Decision and Order." (Emphasis omitted.) The assertion that defendant did not owe the balance of plaintiffs' contracts until the trial court issued its order defies reason. The amount owed derives from plaintiffs' subcontracts, which were knowingly and voluntarily entered into by the parties and were specifically allowed for in the general contract. Once plaintiffs completed their agreed-upon work, defendant was obligated to compensate plaintiffs for said work. The amount owed in no way derives from the trial court's order. The trial court's order enforced the agreed-upon terms of the subcontracts.

¶ 52                          II. Plaintiffs' Cross-Appeal for Attorney Fees

¶ 53        Plaintiffs' cross-appeal argues that the trial court erred in failing to grant attorney fees. "A trial court's decision awarding attorney fees under section 17 of the [Act] is reviewed under the abuse of discretion standard." *Stuart*, 2016 IL App (1st) 143666, ¶ 47.

¶ 54        At the outset, defendant asks the court to dismiss plaintiffs' cross-appeal, stating that plaintiffs have failed to comply with Illinois Supreme Court Rule 341 (eff. Feb. 6, 2013) by (1) failing to begin their brief with a "Points and Authorities" section, instead inserting it farther into

the brief; (2) including an "Introduction" section; and (3) failing to include citations to the record. "Although this court has discretion to strike a brief and dismiss an appeal where a party has failed to comply with Rule 341, doing so is a harsh sanction and is appropriate only when the procedural violations interfere with our review." *In re Marriage of Iqbal*, 2014 IL App (2d) 131306, ¶ 14. Because the deficiencies do not hinder our ability to review the issues at hand, we will not impose the sanction of dismissing plaintiffs' cross-appeal.

¶ 55 Turning to the merits, section 17(b) of the Act states:

"If the court specifically finds that the owner who contracted to have the improvements made failed to pay any lien claimant the full contract price, including extras, without just cause or right, the court may tax that owner, but not any other party, the reasonable attorney's fees of the lien claimant who had perfected and proven his or her claim." 770 ILCS 60/17(b) (West 2008).

Section 17(d) further states:

" 'Without just cause or right,' as used in this Section, means a claim asserted by a lien claimant or a defense asserted by the owner who contracted to have the improvements made, which is not well grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." 770 ILCS 60/17(d) (West 2008).

¶ 56 Here, the trial court held the evidence failed to establish any reason why defendant should not have paid the underlying subcontract amounts. Indeed, the court held that the evidence established that plaintiffs' work was completed on time "and was done in a workmanlike fashion." Defendant, however, failed to satisfy its duty to pay for the work as

defined in the subcontracts. The record establishes defendant was "without just cause or right" to withhold payment to plaintiffs.

¶ 57       We acknowledge that the trial court found plaintiffs were not entitled to "extras." However, section 17(b) does not require that the owner fail to pay the full lien claim without cause, just the full contract price and those extras included in the contract. Stated another way, the fact that defendant may have had "just cause or right" not to pay the unapproved extras portion of the lien claim does not preclude plaintiffs' right to receive attorney fees for failure to pay the "full [sub]contract price." Therefore, we find that the trial court abused its discretion in failing to award attorney fees to plaintiffs. We remand for calculation and imposition of attorney fees.

¶ 58                                                    CONCLUSION

¶ 59       The judgment of the circuit court of Will County is affirmed in part, reversed in part, and remanded with directions.

¶ 60       Affirmed in part and reversed in part.

¶ 61       Remanded with directions.