2024 IL App (2d) 220351-U
No. 2-22-0351
Order filed January 30, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF MEGAN B. VERMAATEN, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 20-D-45 |
| JACOB A. VERMAATEN, | ) ) | Honorable John F. McAdams, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not abuse its discretion when it denied the husband's request for appointment of an evaluator; the trial court did not abuse its discretion when it awarded the wife attorney fees. The trial court is affirmed.

¶ 2    Respondent, Jacob A. Vermaaten, challenges the trial court's denial of his motion to appoint an evaluator under section 604.10 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10 (West 2022)) and the court's grant of respondent, Megan B. Vermaaten's, motion for attorney fees under section 508(b) of the Act (*id.* § 508(b)). For the

reasons that follow, we affirm the trial court's denial of Jacob's motion for a section 604.10 evaluator and its grant of Megan's motion for attorney fees.

¶ 3                                    I. BACKGROUND

¶ 4    The parties were married in 2005 and had four children together: J.V., born in 2008, L.V., born in 2010, C.T., born in 2016, and D.V., born in 2017. In February 2020, Megan filed a petition for dissolution of the parties' marriage, citing as grounds irreconcilable differences. In April 2020 the trial court entered a judgment of dissolution of marriage that incorporated the parties' agreed joint parenting plan. The parenting plan provided that Megan was solely responsible for making decisions regarding the children's education, healthcare, religion, and extracurricular activities. Megan was granted authority to remove the children from Illinois to Ohio to reside. Megan had the majority of parenting time and Jacob had parenting time every other weekend, Christmas and spring breaks, one week during summer vacation, and alternating holidays. In June 2020, Megan and the children relocated to Ohio.

¶ 5    In November 2021 Megan filed a petition to restrict Jacob's parenting time pursuant to section 603.10(a) of the Act (750 ILCS 5/603.10(a) (West 2020)). She alleged that since entry of the judgment of dissolution of marriage Jacob "engaged in a course of conduct that [was] concerning and seriously endanger[ed] the minor children [and that his] harassment and negative conduct ha[d] begun to escalate."

¶ 6    Specifically, Megan alleged the following:

"a. On October 14, 2021, Megan and Jacob were scheduled to meet and exchange the minor children for Jacob to exercise parenting time. The parties agreed to meet at a truck stop gas station to exchange the children. Not only was Jacob approximately 30 minutes late but he wanted the children to be left alone until he got there. In fact, when

Megan would not leave the children alone, he became enraged and sped into the parking lot, exited the car angrily while screaming and swearing at Megan in front of the **children. Based on Jacob's erratic behavior, Megan called the police and maintained** possession of the children.

b. Jacob uses J.V. as a go between with Megan. J.V. has told Jacob he does not want to be the go between. Jacob has told J.V. that he has blocked Megan's cell phone and email. As recently as November 1, 2021, Jacob sent text messages to J.V. demanding that J.V. have L.V. call Jacob. Jacob then threatened J.V. that if he didn't have L.V. call him that Jacob would have someone stop by to check on her (inferring the police).

c. It is suspected that Jacob then 'reported' Megan to Child and Family Services with allegations such as L.V. has no access to a phone and the children do not learn anything at daycare.

d. On August 15, 2021, Megan sent Jacob an email regarding parenting time in September. In response, Jacob sent Megan an inappropriate response with a list of "demands."

e. In June 2021, Jacob intentionally harassed L.V. with a high volume of calls.

f. In June 2021, Jacob sent Megan over 80 inappropriate messages, such as pictures of dancing poop emojis.

g. In May 2021, Megan attempted to discuss the parenting schedule with Jacob to no avail. Jacob's responses were often off course and not good faith communication.

h. Jacob fails to respond appropriately, if at all, to Megan's communications.

i. Jacob has a history of yelling at L.V. if she doesn't answer or call back.

j. Jacob often sends email correspondence to Megan which is programmed to expire by a certain date and is intended to *not have the option to forward, copy, print or download.*" (Emphasis in original).

¶ 7 Megan sought an order to suspend Jacob's parenting time and have video visits instead until he successfully completed anger and parenting behavior treatment programs and participated in counseling with the children, or to reduce Jacob's parenting time and limit electronic communication. Megan also sought an order to direct Jacob to communicate with Megan over "Our Family Wizard,"[1] and to award Megan attorney fees and costs.

¶ 8 On November 15, 2021, Megan filed a petition for rule to show cause, or, in the alternative, to enforce the judgment of dissolution of marriage, and other relief. Megan alleged that Jacob failed to "transfer $31,000 from his retirement account directly into a retirement account of Megan's choosing" in violation of the parties' judgment of dissolution of marriage. Megan alleged that Jacob's failure to comply with judgment was willful and contumacious and asked the court to hold Jacob in indirect civil contempt.

¶ 9 On November 16, 2021, without objection, the trial court appointed guardian *ad litem* (GAL) Jody Thompson-Weis.

---

[1]Our Family Wizard is an application designed to promote better communication between divorced or divorcing parents. It is a tool to help parents communicate, schedule custody, and enter specific appointments for their children. It allows the parents to send messages to each other about what the children are or should be doing during the week and provides a contemporaneous record of those communications. Barry D. Bayer, *Better Searching, and Matrimonial Communication on the Web*, Law Office Technology Review, Nov. 14, 2001, 2001 WL 1829161.

¶ 10    In December 2021, Jacob filed a petition to modify the parenting plan.

¶ 11    Also in December 2021, Jacob filed a response to Megan's petition to restrict parenting time, essentially denying the material allegations contained therein. He also filed a petition for rule to show cause against Megan, alleging, *inter alia*, that she had intentionally interfered with Jacob's visitation and communication with the children in violation of the parenting plan. Jacob also filed a petition for rule to show cause, alleging that Megan had knowingly, willfully, and contumaciously violated the parenting plan.

¶ 12    In February and April 2022, the GAL provided reports to the court and the parties that do not appear in the record on appeal.

¶ 13    Also in April, Jacob filed a petition to enforce allocated parenting time and a second rule to show cause. He also filed a petition to appoint an evaluator pursuant to section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2022)). In his 604.10(b) petition, Jacob alleged that D.V. (born 2017) had "an undiagnosed mental condition," and needed an evaluation to address "his learning disabilities, antisocial behavior and difficulties in communication." Specifically, Jacob alleged: D.V. (1) was "much farther behind in speech capability [than] other children of similar age [and] *** his siblings when they were [his] age"; (2) "exhibited anti-social behavior [in that he did] not socialize with other children in an appropriate manner *** and spends too much time watching television or a tablet alone without supervision"; (3) "does not like to go outside, [or] go to parks; (4) developed a 'flat head' [that was] corrected with a helmet"; and (5) "had mobility problems and needed to go to physical therapy *** to learn how to 'crawl.' "

¶ 14    Jacob also alleged that both D.V. and L.V. were hypersensitive, had severe undiagnosed anxiety, had shut down completely especially over matters of discipline or disagreements with Jacob, had anger management issues and exploded over trivial matters, and displayed extreme

shyness, high levels of irritability over trivial matters, and had traits of depression and episodes of uncontrollable crying. Jacob further alleged that it was in the best interest of the children for the court to appoint a 604.10(b) evaluator to investigate and to report concerning the allocation of parenting time, and decision-making authority and parental responsibilities for the four children.

¶ 15    On May 10, 2022, prior to hearing argument or testimony on Jacob's petition to appoint an evaluator, the court asked the GAL if she was "in favor of" the appointment of an evaluator. GAL replied, "I'm not, your Honor."

¶ 16    Jacob testified that he did not believe that the GAL's investigation was thorough. Jacob raised his concerns with the GAL in notes and letters but during his interview with her he was not given the opportunity to articulate his concerns, he did not get a chance to speak, and she dismissed his views. D.V. demonstrated traits of slow development; the same traits shown by Jacob's younger brother who had been diagnosed with a learning disability many years earlier. According to Jacob, it was not normal for a four-year-old to not want to go outside or interact with people. Jacob's daughter, L.V. was "submerged in negativity against [him] just based on the circumstances we're in. She lives far away. I don't get to see her or talk to her very often, and that's not being taken into consideration. *** [W]ith a proper diagnosis, it will get her much farther ahead, as well as [with D.V.]. We can get them both the help they need so that they won't be shut down and be completely debilitated like they are now." Jacob and Megan have four children and he had no decision-making authority regarding their health issues.

¶ 17    Jacob testified that he asked Megan to have the children evaluated for mental health issues. D.V. needed to be evaluated for learning disabilities. Megan "got him speech therapist, that's all." Megan refused to have D.V. evaluated by a medical doctor. The older child, L.V., age 12, had severe anxiety and, likely, depression, she cries uncontrollably when spoken to in a soft tone and

says she is being yelled at even though "your voice is not raised." She does not have the ability to process problems and deal with them. L.V. completely shuts down. Her problems became worse after the move to Ohio. As an example, Jacob stated that when he is on the phone with L.V. and asks her any question, she asks him why he wants to know. Jacob tells L.V., because I am your father; "it's information I should know [and] you shouldn't question me."

¶ 18    The trial court denied Jacob's petition to appoint an evaluator, finding that it was not in the children's best interests. The trial court reasoned that he understood Jacob's argument that it may be in his strategical best interest to have an evaluator to rebut the GAL's recommendation, but it was not in the best interests of the children to go through more interviews. Jacob's counsel then advised the court that there was a jurisdictional problem because Illinois was no longer the children's home state and that they would be filing a motion to transfer venue to Ohio.

¶ 19    On June 13, 2022, Jacob moved to dismiss his motion to modify the parties' parenting plan and allocation judgment, petition to enforce allocated parenting time, and first and second petitions for rules to show cause. The trial court granted Jacob's motions to dismiss.

¶ 20    On June 21, 2022, Jacob filed a three-count motion for temporary relief (motion to disqualify the GAL). Count I alleged that the GAL failed to submit the renewal of her application to the court administrator in a timely manner and was not properly certified. Count II alleged that the GAL misunderstood section 610.5 of the Act (750 ILCS 5/610.5 (West 2020)) in that she mistakenly believes that Jacob was prohibited from seeking a modification of the parties' parenting plan and allocation judgment because he sought modification within two years after the judgment was entered. Count III alleged the GAL improperly conducted her investigation in that Jacob met with the GAL only once and during that meeting, she berated and taunted him, had a hostile demeanor towards him, refused to allow him to voice his concerns about his children, and denied

that he raised certain concerns regarding the children in a letter he sent to her and failed to investigate his concerns.

¶ 21    On June 24, 2022, Jacob's counsel (David Lee) asked the trial court about its order denying the petition to appoint a 604.10 evaluator, and the following colloquy occurred:

"MR. LEE: —it was my understanding in the order that you were denying our 604.10 petition as to paragraphs (b) and (c); is that correct, judge?

* * *

THE COURT: But you asked for (b).

MR. LEE: As—so there is a 604.10(b), which is the court's witness, and the 604.10(c), which would be our witness, Judge. And so—

THE COURT: But you asked for (b).

MR. LEE: I asked for both, Judge, (b) and (c).

THE COURT: Am I looking at the wrong motion? Enter an order appointing 604.10(b) evaluator to perform an investigation and create a report as to their recommendations. Best interest of the child -- this was from April 20th. Is there another motion?

MR. LEE: No, judge. So I just want to be clear, judge. If we file -- I don't want to be in a situation where I have to file another 604.10 motion.

THE COURT: My rationale for denying the 604.10(b) evaluator would be the same rationale for your own expert because it's what I just said before. It's what's necessary – what's necessary for these children and what's in their best interest[s]. *** I would not want to put them through a doctor, a 604.10(b) doctor appointed by the court, or a 604.10(c) doctor hired by you, excuse me, or by [Megan].

MR. LEE: *** the only issue we have with the denial of the 604.10(c) is we have no way to rebut [the GAL's] recommendation.

* * *

THE COURT: And your focus is where it should be on your client, putting your client in the best position it can be. My focus is on what's best for the children, not what's best for mom or dad strategically in court.

Certainly I understand why you would want the court appointed one or even your own one, but here's the difficulty: The difficulty is if we left it up to the parties and we didn't think about the kids, what would happen is the court-appointed [GAL] *** would make a recommendation, then what would happen is if one side, one party didn't like that recommendation, they do a [604.10(b)], a hired person. And then let's say that person is either consistent or inconsistent with the [GAL]. One side is not going to like that. So what will happen is they'd hire a 604.10(c) so that they could come back with, the [GAL] or [604.10(b)] evaluator, to again put themselves in the best strategical position.

* * *

So then what you have is you have a guardian doing an investigation, interviewing the kids several times. You have a court-appointed evaluator interviewing the kids several times. You have one party, first party's doing the same thing, and the second party's doing the same thing. *** So you are talking four extensive evaluations for the four kids. That's not in their best interest. It may be in the parties' best interest strategically to have somebody on their side—or, I mean, or strategically, you know, maybe look, to use your words, I don't have anybody to rebut the guardian, so I want a (b), a [604.10(b)].

* * *

Then let's assume that evaluator is consistent with the GAL. All right. well, now I want a (c) cause now you really need it 'cause now you got two people against you, right? How are you going to win your case? To rebut two people, well, you gotta hire a third. So now you have a third one. And who knows, maybe the third one would say the same thing as the other two. But the point is it's not a matter of what's best strategically for the mom or the dad. The issue is what's best for the children and is it necessary for the children. I found before that there were no special circumstances that we needed to do that and that's within my discretion. And I'm not going to – I'm going to exercise my discretion in a way that shelters and favors the children over the parties' strategical positions.

There is no need, we have a guardian that's been doing this for over 10 years, since before I was a judge. She was—when I was a lawyer, she was a guardian. So it's been over 11 years she's been doing this and I'm just not inclined to do the 604(b) as I said and the same rationale for that on a (b) would apply to a (c)."

¶ 22 On July 18, 2022, a hearing began on Jacob's motion to disqualify the GAL. On Jacob's motion, count I was voluntarily dismissed. The hearing continued on the remaining two counts. After considering the evidence the court determined that Jacob "failed to meet his burden," and denied Jacob's motion to disqualify the GAL.

¶ 23 On July 27, 2022, a hearing began on Megan's petition to restrict Jacob's parenting time. Jacob objected to the trial court's subject matter jurisdiction, arguing that Illinois was no longer the home state of the children because they resided in Ohio. After argument on Jacob's oral motion the trial court denied his request to decline subject-matter jurisdiction reasoning, in part, that Jacob had acquiesced to the court's jurisdiction when he raised the issue seven months after Megan filed her petition to restrict parenting time, and after Jacob failed to object when the court appointed the

GAL and then filed numerous motions. In response to the trial court's ruling, Jacob's counsel stated that he refused to participate in the hearing on Megan's petition to restrict his parenting time.

¶ 24    The GAL testified that she had interviewed Jacob and Megan "multiple times," all four children, J.V. once, and L.V. once, read Jacob's letters, and reviewed the parties' emails and text messages. Jacob wanted to separate the children; the two older children would live with Megan in Ohio and the younger children would live with Jacob in Illinois. The parties communicate very poorly, with profanity and name calling, with the bigger problems occurring when Jacob does not get the answers he wants. Also, Jacob prods L.V. for information and uses her as a go between with Megan. Jacob persistently calls and messages the children. The two younger children are very gregarious, "a lot of fun, and did not seem to have anti-social issues." Although D.V. was quiet as a toddler, by all accounts he has been socializing more ever since C.V. entered kindergarten. D.V. "has been really coming out of his shell."

¶ 25    The GAL testified that, according to the children, Megan, and Megan's fiancé, during an exchange of the children at a truck stop, Jacob pulled into the parking lot behind Megan's car, slammed on the brakes, gravel flying, and Jacob got out of his car and yelled at Megan. J.V., the oldest boy, told the GAL that he and all the kids were scared. He was the only one not crying because he did not want anyone to know that he was scared. Megan's fiancé called the sheriff's department. When Jacob found out that Megan's fiancé had called the sheriff's department, he left the scene without the children. Jacob told the GAL that he did not return the sheriff department's phone calls but did not give a reason. J.V. told the GAL that Jacob speaks poorly about Megan but Megan does not speak poorly about Jacob. J.V. wished his parents lived in the same town. He did not want to live at his dad's house because he did not want to be separated from his siblings. It

seemed obvious to J.V. that his dad did not know how to parent a girl (L.V.). The GAL provided examples of situations when Jacob "joked" with L.V. in a way that hurt her feelings, like calling her spoiled when she showed him a cellphone that she earned the money for and telling her that coming in third in a swimming competition was not good enough.

¶ 26    L.V. told the GAL that her father insults her mother and is very angry with her. L.V. was afraid that her dad was so mad at her mom that he would come into the house and kill them all including their dog. L.V. told the GAL that her dad thinks she's crazy because she knows who he is. The GAL opined that there were problems based on Jacob's negative behaviors.

¶ 27    The GAL recommended counseling for L.V, specific communication schedule, a prohibition from using any child as a go-between, and, as Jacob suggested to her, "one weekend per month that coincides with a long school holiday during the school year and a non-holiday weekend during the summer."

¶ 28    On July 28, 2022, the trial court granted, in part, Megan's petition to restrict Jacob's parenting time and modified the parties' parenting plan. The court reduced Jacob's regular parenting time to an extended three- or four-day weekend based on the children's school calendar and a non-holiday week during the summer and a non-holiday weekend during the summer. Telephone calls and video chats were limited to 15 and 30-minute sessions at scheduled times in the evenings. Most notably, the court ordered the following. "[Megan] shall enroll [L.V.] in counseling, immediately. Both parties shall cooperate and participate as directed by the counselor."

¶ 29    Also, on July 28, 2022, a hearing began on Megan's petition for rule to show cause. The trial court found Jacob in contempt, but that the contempt had been purged by Jacob's payment to Megan in April 2022. The court granted Megan leave to file a petition for attorney fees.

¶ 30    On August 3, 2022, Megan filed a three-count petition for attorney fees pursuant to section 508 of the Act (750 ILCS 5/508 (West 2022)). Citing section 508(b) of the Act, count I sought attorney fees and costs (in the amount of $3498) related to Megan's petition for rule to show cause against Jacob, and fees and costs (in the amount of $700) related to filing the petition for attorney fees. Count II sought attorney fees and costs for vexatious litigation pursuant to section 508(b). Megan alleged that Jacob's voluminous filings of pleadings followed by the dismissal of said pleadings, his request for an evaluator, and his litigation to disqualify the GAL were for "improper purposes and needlessly increased the cost of litigation." Count III sought contribution to attorney fees pursuant to section 508(a) of the Act. She alleged that she earns approximately $77,000 a year and Jacob earns approximately $150,000 a year. Megan sought $20,292.00, less any amount awarded under Count I or II for attorney fees and costs and $700 for attorney fees and costs incurred in preparing the petition.

¶ 31    On August 5, 2022, the trial court granted Megan's petition for attorney fees as to all three counts. Regarding count II the trial court found that Jacob's litigation related to his request to disqualify and remove the GAL was "vexatious." The trial court also found that Jacob's actions were "precipitated or conducted for an improper purpose."

¶ 32    On August 26, 2022, Jacob filed a two-count "Post-trial Motion (Motion to Reconsider)" (post-judgment motion). Count I alleged that the trial court erred "both legally and factually when [it] denied [his] request" for 604.10(b) and 604.10(c) evaluators, and that the court abused its discretion when it found that the appointment of an evaluator was not in the best interests of the children. Count II alleged that the trial court erred when it determined that it had subject-matter jurisdiction even though Illinois was not the home state of the children pursuant to section 201 of the UCCJEA (750 ILCS 36/201 (West 2022)).

¶ 33    On September 2, 2022, the trial court heard argument on Jacob's post-judgment motion with Jacob's counsel standing on the arguments set forth in the motion. At the end of the hearing, the trial court denied Jacob's motion. On September 30, 2022, Jacob filed a notice of appeal listing three orders: (1)the order granting, in part, Megan's motion to restrict Jacob's parenting time (entered July 28, 2022), (2) the order granting Megan's petition for attorney fees (entered August 5, 2022), and (3) the order denying Jacob's post-judgment motion (entered September 2, 2022).

¶ 34                                    II. ANALYSIS

¶ 35    Initially, we address Megan's argument that we should dismiss Jacob's appeal for his failure to comply with Supreme Court Rule 341(h)(7) (S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (an argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"). Although we agree that Jacob advances a perfunctory analysis of the issues, fails to cite relevant authority, and misstates the record, the deficiencies do not hinder or preclude our review. We therefore decline to dismiss Jacob's appeal. See *Carter v. Carter*, 2012 IL App (1st) 110855, ¶ 12 ("Although our review of [appellant's] brief reveals that it fails to comply with Rules 341(h)(6) and (h)(7), we conclude that her violations of those rules do not hinder our review of the case ***.").

¶ 36    We note that Jacob's brief does not challenge the trial court's order that granted, in part, Megan's petition to restrict Jacob's parenting time. Rather, Jacob's brief attacks only the trial court's orders that denied his request for an evaluator, granted Megan's motion for attorney fees, and allocated certain GAL's fees to be paid by Jacob.

¶ 37                        A. Denial of Motion to Appoint an Evaluator

¶ 38    Jacob argues that the trial court erred when it denied his motion to request an evaluator under section 610.04(b) and (c) of the Act. Jacob contends that the trial court departed from the plain language of the statute when it read into it conditions that the legislature did not express.

¶ 39    Our review of the record reveals that Jacob failed to present the issues he now presents to this court regarding the interpretation of section 610.04 to the trial court for argument and consideration or in his post-judgment motion. Indeed, he raises these arguments for the first time in this appeal. As such, these issues are forfeited. It is well settled that "[i]ssues not raised in the trial court are [forfeited] and cannot be argued for the first time on appeal." *In re Marriage of Minear*, 181 Ill. 2d 552, 564 (1998); *McKinney v. Castleman*, 2012 IL App (4th) 110098, ¶ 20.

¶ 40    The forfeiture in this case is a particular form of forfeiture called a procedural default. Jacob never raised the claim of error in the trial court and thus did not give the trial court the opportunity to clarify, explain or reconsider its decision regarding its alleged erroneous interpretation of section 604.10. Having failed to address these issues below Jacob seeks *de novo* review of the trial court's order denying his request for the appointment of a 604.10 evaluator. Megan does not raise forfeiture. However, it is not our function to review matters raised for the first time on appeal, especially exercises of discretion (see *In re Marriage of Iqbal and Khan*, 2014 IL App (2d) 131306, ¶ 44 (the determination of whether a child custody evaluator should be appointed is within the broad discretion of the trial court)).

¶ 41    Forfeiture notwithstanding, we do not accept that Jacob's arguments have merit. Jacob claims that the trial court "violated every rule of statutory construction" because it (1) inserted the need for "special circumstances" into the statute, (2) noted its "policy in the past," and (3) improperly asked the GAL how it should rule on his motion.

¶ 42    The record establishes that the trial court properly applied section 604.10(b) and (c). Section 604.10(b) provides, in part, that "The court may seek the advice of any professional, whether or not regularly employed by the court, to assist the court in determining the child's best interests." 750 ILCS 5/604.10(b) (West 2022). Section 604.10(c) provides, in part:

> "In a proceeding to allocate parental responsibilities or to relocate a child, *upon notice and motion* made by a parent or any party to the litigation *within a reasonable time before trial*, the court shall order an evaluation to assist the court in determining the child's best interests unless the court finds that an evaluation under this Section is untimely or not in the best interests of the child." *Id.* § 604.10(c). (Emphasis added.)

The purpose of the statute is to make the information available to assist the court and protect the interests of minor children regarding issues of custody and visitation. *In re Marriage of Debra N. & Michael S.*, 2013 IL App (1st) 122145, ¶ 51 (construing prior version of statute).

¶ 43    We will not disturb a trial court's decision to deny a motion to appoint an evaluator absent an abuse of discretion. See *In re Marriage of Iqbal and Khan*, 2014 IL App (2d) 131306, ¶ 44. A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Brown v. Illinois State Police*, 2021 IL 126153, ¶ 49.

¶ 44    Jacob fails to explain how any of the cherry-picked, out of context remarks he lifts from the record affected the trial court's interpretation of section 604.10(b) or (c) leading to its denial of his motion to appoint an evaluator. When read in context, it is clear that the trial court did not require "special circumstances," rather it considered the best interests of the children. The trial court stated, "[t]he issue is what's in the best interests of the children. I found before that there were no special circumstances that we needed to do that and that's within my discretion."

¶ 45    Further, the record shows that the trial court asked the GAL's opinion about the appointment of an evaluator. However, the record reveals that the trial court did not "rubber stamp" the GAL's recommendation and did not rely solely on the GAL's opinion.

¶ 46    Similarly, Jacob fails to explain how the trial court's comment regarding his "policy in the past" affected its decision. The record reveals that after considering Jacob's testimony, the GAL's recommendation, and counsel's argument, the trial court expressly found that it would not be in the children's best interests to appoint an evaluator under section 604.10(b) or (c). The court acknowledged that Jacob had a strategical interest in the appointment of an evaluator and then weighed that interest against the four children's interests of being repeatedly interviewed. Ultimately, the trial court found that the appointment of a 604.10(b) or (c) evaluator was not in the best interests of the children. On this record, we cannot say that the trial court's decision was arbitrary or unreasonable, or that the court abused its discretion.

¶ 47    In addition, we note that Jacob failed to comply with section 604.10(c), which required notice and a motion within a reasonable time before trial. 750 ILCS 5/604.10(c) (West 2022). Indeed, he never moved for a 604.10(c) evaluator in the trial court. Instead, 33 days before trial, Jacob's counsel admitted to the court that he had not filed a 604.10(c) motion and then asked the court how it would rule *if* he filed the motion. Yet, nothing in the record indicates that Jacob actually moved for a 604.10(c) evaluator. For this reason, Jacob failed to comply with the statute.

¶ 48                                B. Attorney Fees

¶ 49    Next, Jacob argues that the trial court abused its discretion when, after it rewrote section 604.10, it ordered him to pay Megan's attorney fees after it found his motion to appoint an evaluator to be vexatious. Megan argues that the trial court properly granted count II of her petition

for attorney fees pursuant to section 508(b) of the Act (750 ILCS 5/508(b) (West 2022)). Section 508(b) provides in part:

"If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." *Id.*

¶ 50    Thus, the statute mandates the assessment of costs and attorney fees when the court finds that a hearing was "precipitated or conducted for any improper purpose," including, but not limited to, "harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2022); *In re Marriage of Mouschovias*, 359 Ill. App. 3d 348, 357-58 (2005). An award of attorney fees under section 508(b) will not be reversed absent a clear abuse of discretion by the trial court. *In re Marriage of Michaelson*, 359 Ill. App. 3d 706, 715 (2005). Under this standard, we will reverse only if no reasonable person could agree with the trial court. *In re Marriage of Keller*, 2020 IL App (2d) 180960, ¶ 11.

¶ 51    Here, contrary to Jacob's representation, the trial court found that Jacob's motion to disqualify the GAL was vexatious. The court did not find that Jacob's motion to appoint an evaluator was vexatious. The court stated:

"Regarding count 2, the vexatious litigation [claim], I started to go through the history of this case and that's what leads me to believe that the motions regarding [the GAL] were vexatious. The motions seeking to remove her as [GAL] were vexatious in the fact that they were filed only after a recommendation was given. They were only filed after the motion for a 604.10 evaluator was denied. *** [Jacob argued] that the 604.10 evaluator

was necessary to rebut the recommendations from the [GAL]. I think when that failed, the next step was to ask that she be disqualified. And then when that failed *** then this jurisdictional issue came up. I find these actions by [Jacob] in trying to have [the GAL] removed were vexatious. They were not necessary or reasonable under the circumstances because I felt that the improper purpose was to have her removed to allow him to be able to argue that he should have the time he was asking for *** contrary to what [the GAL] said.

*  *  *

I find these acts needlessly increased the cost of litigation. Clearly, I found that [Megan's counsel] had to spend 9.5 hours defending an action that I didn't think was necessary under the circumstances. *** So I'm gonna award $300 an hour for 9 hours which is $2,700."

¶ 52    Quite simply, Jacob cites nothing in the record that contradicts the trial court's findings. Accordingly, based on our review of the proceedings, we conclude that the trial court did not abuse its discretion in granting Megan's request for attorney fees on count II of her petition.

¶ 53    Finally, Jacob notes that the trial court ordered him to pay $2612 to the GAL for fees associated with time expended on his motion to disqualify her. However, Jacob did not raise this issue in his post-judgment motion or in his notice of appeal, and so he forfeits the issue. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 14; *In re Marriage of Goesel*, 2017 IL 122046, ¶ 12. Further, Jacob raises this issue in only one conclusory sentence in his brief and makes no argument in support of it in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). We are entitled to have issues clearly defined with pertinent authority and coherent arguments presented;

arguments inadequately presented on appeal are forfeited. *Maday v. Township High School District 211*, 2018 IL App (1st) 180294, ¶ 50. Thus, this issue is forfeited.

¶ 54                                       III. CONCLUSION

¶ 55    For the reasons stated, the judgment of the circuit court of Kendall County is affirmed.

¶ 56    Affirmed.